No. 22-12366-A

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ERIC ROMANO,

Plaintiffs-Appellants,

v.

JOHN HANCOCK LIFE INSURANCE COMPANY (USA),

Defendant-Appellee.

———————————

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 19-CV-21147

———————————

## BRIEF FOR PLAINTIFFS-APPELLANTS

———————————

Peter Prieto                          John Scarola
Matthew P. Weinshall                  Boris L. Zhadanovskiy
**Podhurst Orseck, P.A.**             **Searcy Denney Scarola**
One S.E. 3rd Avenue, Suite 2300       **Barnhart & Shipley, P.A.**
Miami, Florida 33131                  2139 Palm Beach Lakes Blvd.
305-358-2800                          West Palm Beach, Florida 33409
                                      (561) 686-6300

                                      *Counsel for Plaintiffs*

*Eric Romano, et al. v. John Hancock Life Insurance Co. (USA)*,
No. 22-12366-A

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Appellants submit this list, which includes all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

1.  Carswell, Esq., DeMario M., counsel for Defendant-Appellee.

2.  Del Riego, Esq., Alissa, counsel for Plaintiffs-Appellants.

3.  Drake, Esq. Ashley M., counsel for Defendant-Appellee.

4.  Fahey, Esq., Katherine M., counsel for Defendant-Appellee.

5.  Fleckner, Esq., James O., counsel for Defendant-Appellee.

6.  Goodwin Procter LLP, counsel for Defendant-Appellee.

7.  Gould, Esq., Gabriel L., counsel for Defendant-Appellee.

8.  Gravante, III, Esq., John, counsel for Plaintiffs-Appellants

9.  Gray Robinson, P.A., counsel for Defendant-Appellee.

10. John Hancock Life Insurance Company (USA), Defendant-Appellee.

11. Podhurst Orseck, P.A., counsel for Plaintiffs-Appellants.

12. Prieto, Esq., Peter, counsel for Plaintiffs-Appellants.

13. Quintana, Esq., Marlene, counsel for Defendant-Appellee.

*Eric Romano, et al. v. John Hancock Life Insurance Co. (USA),*
No. 22-12366-A

14.    Reilly, Esq. Benjamin S., counsel for Defendant-Appellee.

15.    Romano, Eric, Plaintiff-Appellant.

16.    Romano, Todd, Plaintiff-Appellant.

17.    Romano Law, PL 401(k) Plan, Plaintiff-Appellant.

18.    Scarola, Esq., Jack, counsel for Plaintiffs-Appellants.

19.    Searcy Denney Scarola Barnhart & Shipley, P.A.

20.    Searcy, Esq., Christian D., counsel for Plaintiffs-Appellants.

21.    Weinshall, Esq., Matthew P., counsel for Plaintiffs-Appellants.

22.    Zhadanovskiy, Boris, counsel for Plaintiffs-Appellants.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Appellants state upon information and belief that Defendant/Appellee John Hancock Life Insurance Company (USA) is an indirectly wholly owned subsidiary of Manulife Financial Corporation. Manulife Financial Corporation is traded on the Toronto (TSX:MFC), New York (NYSE:MFC), and Hong Kong (HK:MFC) Stock Exchanges.

*s/ Matthew P. Weinshall*
MATTHEW P. WEINSHALL

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs respectfully submit that oral argument may facilitate the Court's resolution of this appeal.  This certified class action presents an important question of first impression concerning the treatment of foreign tax credits under the Employee Retirement Income Security Act of 1974.  Resolving this important question of federal law, which will impact more than 60,000 retirement plans in the certified class, warrants the extra scrutiny that oral argument affords.

## TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ...................................i

INTRODUCTION..................................................................................1

STATEMENT OF JURISDICTION........................................................2

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE .................................................................3

      A.    Factual Background......................................................3

            1.    Hancock's 401(k) "Signature" Platform................4

            2.    Hancock's Undisclosed Retention of Foreign Tax Credits. ..............................................7

            3.    Hancock's Uniform Conduct Towards Plaintiffs.............................................................11

      B.    Procedural History .....................................................12

SUMMARY OF ARGUMENT .................................................................15

STANDARD OF REVIEW......................................................................17

ARGUMENT .........................................................................................17

     I.    THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFFS LACK STANDING TO ASSERT THEIR ERISA CLAIMS. ............19

    II.    THE DISTRICT COURT ERRED IN CONCLUDING THAT HANCOCK WAS NOT AN ERISA FIDUCIARY FOR PLAINTIFFS' CLAIMS..............23

A.  Hancock Was an ERISA Fiduciary Because It Exercised Authority or Control Respecting Management or Disposition of FTCs, Which Are Plan Assets. ......................................... 25

B.  Hancock Was an ERISA Fiduciary Because It Had and Exercised Discretionary Authority or Control Over Management and Administration of the Plans ................................................. 35

III.  THE DISTRICT COURT ERRED IN CONCLUDING THAT HANCOCK DID NOT BREACH ITS ERISA FIDUCIARY DUTIES. ...................... 48

IV.  THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFFS DID NOT ESTABLISH LOSS CAUSATION. ...................... 53

CONCLUSION ................................................. 55

CERTIFICATE OF COMPLIANCE ........................ 57

CERTIFICATE OF SERVICE ............................... 58

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan,*
    833 F.3d 1299 (11th Cir. 2016) ............................................................29

*Brady v. Carnival Corp.,*
    33 F.4th 1278 (11th Cir. 2022) .............................................................3

*Briscoe v. Fine,*
    444 F.3d 478 (6th Cir.2006) ................................................................47

*Comm. on Judiciary of United States House of Representatives v.*
    *McGahn,*
    968 F.3d 755 (D.C. Cir. 2020)..............................................................20

*Culverhouse v. Paulson & Co.,*
    813 F.3d 991 (11th Cir. 2016) ..............................................................20

*Cutaiar v. Marshall,*
    590 F.2d 523 (3d Cir.1979)...................................................................52

*David P. Coldesina, D.D.S. v. Est. of Simper,*
    407 F.3d 1126 (10th Cir. 2005) ......................................................38, 39

*Davidson v. Cook,*
    567 F.Supp. 225 (E.D. Va. 1983).........................................................51

*Donovan v. Bierwirth,*
    680 F.2d 263 (2d Cir. 1982)..................................................................48

*Dupree v. Prudential Ins. Co. of Am.,*
    No. 99-8337-CIV.-JORDAN, 2007 WL 2263892 (S.D. Fla. Aug. 7,
    2007) ...................................................................................................46

*Edmonson v. Lincoln Nat. Life Ins. Co.,*
    725 F.3d 406 (3d Cir. 2013)......................................................23, 34, 35

*F.H. Krear & Co. v. Nineteen Named Trs.*,
  810 F.2d 1250 (2d Cir. 1987) ......................................... 38, 39

*Felber v. Estate of Regan*,
  117 F.3d 1084 (8th Cir. 1997) ............................................. 49

*Gimeno v. NCHMD, Inc.*,
  38 F.4th 910 (11th Cir. 2022) ........................... 24, 37, 47, 54

*Golden Star, Inc. v. Mass Mut. Life Ins. Co.*,
  22 F. Supp. 3d 72 (D. Mass. 2014) ..................................... 38

*Guyan Int'l, Inc. v. Pro. Benefits Adm'rs, Inc.*,
  689 F.3d 793 (6th Cir. 2012) ................................... 25, 47, 49

*Hamilton v. Allen-Bradley Co.*,
  244 F.3d 819 (11th Cir. 2001) ...................................... 24, 47

*Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
  302 F.3d 18 (2d Cir. 2002) ........................................... 39, 40

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*,
  530 U.S. 238 (2000) ............................................................ 52

*Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*,
  961 F. Supp. 2d 393 (D. Conn. 2013) ................................. 40

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ............................................. 45

*Hughes v. Nw. Univ.*,
  142 S. Ct. 737 (2022) .................................................... 45, 46

*Hugler v. Byrnes*,
  247 F. Supp. 3d 223 (N.D.N.Y. 2017) ................................. 51

*In re Halpin*,
  566 F.3d 286 (2d Cir. 2009) ............................................... 26

*In re Luna*,
  406 F.3d 1192 (10th Cir.2005) ........................................... 26

v

*ITPE Pension Fund v. Hall,*
  334 F.3d 1011 (11th Cir. 2003) .......................................................... 27

*John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank,*
  510 U.S. 86 (1993) .................................................................... 24, 25

*Kalda v. Sioux Valley Physician Partners, Inc.,*
  481 F.3d 639 (8th Cir. 2007) .......................................................... 26, 27

*Lanfear v. Home Depot, Inc.,*
  679 F.3d 1267 (11th Cir. 2012) .......................................................... 42

*Lee v. Blue Cross/Blue Shield of Alabama,*
  10 F.3d 1547 (11th Cir. 1994) .......................................................... 29

*Leimkuehler v. Am. United Life Ins. Co.,*
  713 F.3d 905 (7th Cir. 2013) .......................................................... 44, 45

*Lewis v. Governor of Alabama,*
  944 F.3d 1287 (11th Cir. 2019) .......................................................... 19

*Lowen v. Tower Asset Mgmt., Inc.,*
  829 F.2d 1209 (2d Cir. 1987) .......................................................... 52

*McCaffree Fin. Corp. v. Principal Life Ins. Co.,*
  811 F.3d 998 (8th Cir. 2016) .......................................................... 43, 44

*Merrimon v. Unum Life Ins. Co. of Am.,*
  758 F.3d 46 (1st Cir. 2014) .......................................................... 26

*Mertens v. Hewitt Assocs.,*
  508 U.S. 248 (1993) .......................................................... 24

*Ouachita Watch League v. Jacobs,*
  463 F.3d 1163 (11th Cir. 2006) .......................................................... 17

*Patelco Credit Union v. Sahni,*
  262 F.3d 897 (9th Cir. 2001) .......................................................... 26

*Pegram v. Herdrich,*
  530 U.S. 211 (2000) .......................................................... 23, 37, 48, 49

vi

*Peters v. Aetna Inc.*,
    2 F.4th 199 (4th Cir. 2021)..................................................40

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan*,
    722 F.3d 861 (6th Cir. 2013) ...............................................53

*Rosen v. TRW, Inc.*,
    979 F.2d 191 (11th Cir. 1992) .............................................47

*Rozo v. Principal Life Ins. Co.*,
    949 F.3d 1071 (8th Cir. 2020) .............................................45

*Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.
    (U.S.A.)*,
    768 F.3d 284 (3d Cir. 2014).................................... 43, 44, 45

*Santomenno v. Transamerica Life Ins. Co.*,
    883 F.3d 833 (9th Cir. 2018) ........................................ 43, 44

*Sec'y of Lab. v. Doyle*,
    675 F.3d 187 (3d Cir. 2012)..................................................27

*Sec'y U.S. Dep't of Lab. v. Koresko*,
    646 F. App'x 230 (3d Cir. 2016)..................................... 26, 28

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) .............................................................31

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................20

*Thole v. U.S. Bank N.A*,
    140 S. Ct. 1615 (2020) ........................................................22

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) .................................................. 19, 22

*Trichell v. Midland Credit Mgmt., Inc.*,
    964 F.3d 990 (11th Cir. 2020) ............................................21

*Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt.*,
  843 F.3d 561 (2d Cir. 2016)............................................................21, 22

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) ............................................................45

*Useden v. Acker*,
  947 F.2d 1563 (11th Cir. 1991) ........................................................46

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996) ....................................................................50, 51

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................20

## Statutes

26 U.S.C. § 61(a) ...............................................................................7

26 U.S.C. § 853 .................................................................................8

26 U.S.C. § 901 .................................................................................8

28 U.S.C. § 1291 ...............................................................................2

28 U.S.C. § 636(c) ...........................................................................12

29 U.S.C. § 1002(21)(A) .............................................................23, 24

29 U.S.C. § 1102(a) ........................................................................23

29 U.S.C. § 1104(a)(1)(A) .............................................18, 48, 49, 53

29 U.S.C. § 1106(b)(1)..............................................................18, 52, 53

29 U.S.C. § 1106(b)(3).....................................................................52

29 U.S.C. § 1108(b)(2)(B)(ii)(I)(dd)(AA) ..................................30

29 U.S.C. § 1108(b)(2)(B)(iii)(III) ............................................29

29 U.S.C. § 1109(a) ....................................................................19, 54

29 U.S.C. § 1132 ............................................................... 17

**Other Authorities**

U.S. Dep't of Labor, Office of Pension and Welfare Benefit Programs
  (E.R.I.S.A.), Advisory Op. No. 93–14A,
  1993 WL 188473 (May 5, 1993) ................................. 26, 31

U.S. Dep't of Labor, Technical Release No. 2011-04 (Dec. 2, 2011) . 31, 32

**Rules**

Fed. R. Civ. P. 23(b)(3) ................................................ 13

Fed. R. Civ. P. 56(a) ..................................................... 17

Fed. R. Civ. P. 73 ........................................................... 12

**Regulations**

29 C.F.R. § 2510.3-101(h)(1)(iii) .................................. 36

29 C.F.R. § 2550.401c-1 ................................................ 36

29 C.F.R. § 2550.408b-2(c)(1)(iv)(C) ........................... 30

29 C.F.R. § 2550.408b-2(c)(1)(viii)(B) .......................... 30

## INTRODUCTION

This appeal challenges the district court's order granting Defendant John Hancock Life Insurance Company (USA) ("Hancock") summary judgment on two ERISA[1] claims asserted by Plaintiffs Eric and Todd Romano, as Trustees of the Romano Law, PL 401(k) Plan, on behalf of a certified class of approximately 60,000 similarly situated retirement plans.[2]

Plaintiffs' claims arise from Hancock's undisclosed retention of foreign tax credits generated by retirement assets entrusted to it by the Plans. Under standardized form contracts, the Plans placed retirement assets in Hancock's "Separate Accounts" for investment in various mutual funds. Some of these mutual funds held foreign securities and incurred foreign taxes. Hancock did not actually pay these foreign taxes; rather, the Plans ultimately did, as the value of their investments fell by the amount of taxes paid. Nonetheless, Hancock received and retained the benefit of dollar-for-dollar foreign tax credits that the payment of

---

[1] ERISA is the Employee Retirement Income Security Act of 1974.

[2] For the sake of simplicity, unless otherwise specified, "Plaintiffs" will mean the certified class, and "Plan" or "Plans" will mean the retirement plans included in the certified class.

these taxes generated. Hancock, however, did not reveal this compensation to the Plans, contrary to its disclosure obligations. Nor did it use such compensation to offset the administrative fees that it charged the Plans, contrary to the terms of its standardized form contracts. This uniform conduct cost the Plans more than $90 million and violated Hancock's strict fiduciary duties under ERISA.

The district court's order rests on its erroneous conclusion that Hancock was not an ERISA fiduciary when it received and profited from the foreign tax credits generated by Plaintiffs' ERISA-protected investments. This conclusion clashes with prevailing law and the record. And it underlies the district court's alternative, equally flawed rationales regarding standing, breach of fiduciary duty, and loss causation. The district court's erroneous summary judgment in favor of Hancock should be reversed, and the case should be remanded for trial.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. § 1291, because this is an appeal from a final judgment entered against Plaintiffs

on June 22, 2022.  App.351.[3]  Plaintiffs filed a timely notice of appeal on July 15, 2022.  App.352.

## STATEMENT OF THE ISSUES

Whether the district court erred in concluding that Plaintiffs lacked standing to bring their ERISA claims, which seek monetary relief for Hancock's violation of its ERISA fiduciary duties?

Whether the district court erred in granting Hancock summary judgment based on its erroneous, interrelated conclusions that Hancock was not an ERISA fiduciary, that Hancock did not breach any fiduciary duties, and that Hancock did not cause Plaintiffs any monetary loss?

## STATEMENT OF THE CASE

### A.   Factual Background

Because the case was decided at summary judgment, the following facts and reasonable inferences drawn therefrom are presented in the light most favorable to Plaintiffs, the non-moving party.  *Brady v. Carnival Corp.*, 33 F.4th 1278, 1281 (11th Cir. 2022).

---

[3] "App.__" refers to the Appendix, specified tab, and if applicable, page number.  "Doc.__" refers to the district court docket.  As numerous documents were filed under seal and thus not accessible to the parties with docket stamps, Plaintiffs will also identify, where applicable, the specific exhibit referenced—for example, Doc.272-2 (Carlson Dep.).

### 1.    Hancock's 401(k) "Signature" Platform.

Hancock is an insurance company that provides, among other things, investment and recordkeeping services to 401(k) retirement plans.[4]  App.339, ¶ 1.  While Hancock offers a variety of products or "platforms" to retirement plans, this action concerns the services it provides through its "Signature" platform, which is run by its Retirement Plan Services ("RPS") division.  Doc.266-5 (Holden Dep.) at 18:14–19:2; App.339, ¶ 2.  With each retirement plan that signs up for the Signature platform, Hancock enters into two standardized form contracts—a group annuity contract (the "Contract") and a recordkeeping agreement ("RKA").  Doc.266-5 (Holden Dep.) at 23:8–14.  Plaintiffs, as Trustees of the Romano Law, PL 401(k) Plan, entered into a Contract and RKA with Hancock in October 2014.  Doc.1-1 (Contract); Doc.1-2 (Supplemental Information Guide); Doc.110-11 (RKA).  Under these agreements, Hancock provides a menu of investment options and recordkeeping

---

[4] Many employers sponsor and offer their employees 401(k) retirement plans, which are private, employer-based defined-contribution retirement plans that meet the requirements of § 401(k) of the Internal Revenue Code.

4

services to retirement plans like the Romano Law 401(k) Plan. *Id.*; Doc.266-5 (Holden Dep.) at 22:2–26:9, 45:14–19.

The investment options made available on the Signature platform include a number of mutual funds. Doc.256-14 (Fund Information Guide). Hancock first chooses a group of mutual funds for the platform, and each retirement plan then chooses a subset of those funds for investment by its participants, with the Plan's choices specified on the group annuity application that becomes part of the Contract. Doc.266-5 (Holden Dep.) at 22:2–26:9, 36:17–37:2, 44:19–46:12; App.1-1 (Contract). From the subset of mutual funds chosen by a Plan, the individual participants choose specific funds to invest in. Doc.266-5 (Holden Dep.) at 22:2–26:9, 46:4–13.

Technically, however, the Plans and their participants do not invest directly in the mutual funds. Doc.266-5 (Holden Dep.) at 51:17–53:10. Rather, their retirement assets are placed in Separate Accounts at Hancock. *Id.* at 38:16–21, 38:16–21, 41:19–43:8, 51:17–53:10. The Separate Accounts are established, administered, owned, and managed by Hancock, but they are not chargeable with any of Hancock's liabilities outside of the Contracts and RKAs—hence the "Separate" label. *Id.* at

5

31:12–32:12, 38:16–21, 39:21–25, 40:7–41:6, 41:19–43:8; App.1-1 (Contract) at 3. The Separate Accounts, in turn, are divided into sub-accounts that correspond to the mutual funds and other investment options available under the Contracts that Hancock maintains with the Plans. Doc.266-5 (Holden Dep.) at 37:18–24, 43:19–46:3. And the sub-accounts are divided into "Units" that track the performance of shares of a selected mutual fund investment, with the price per Unit calculated by dividing the total value of the assets of the sub-account by the number of Units in the sub-account. *Id.* at 43:13–47:17; App.1-1 at 17.

This structure of Separate Accounts and sub-accounts allows Hancock to pool the investments of thousands of retirement plans. Doc.266-5 (Holden Dep.) at 52:15–25. Based on the combined contributions to the sub-accounts made by all the plans and participants on the Signature platform, Hancock sells and purchases mutual fund shares on an omnibus basis and acts as a single shareholder vis-à-vis the mutual funds. *Id.* And it provides recordkeeping services to track the value of these investments for each plan and participant. *Id.* at 48:8–13.

Hancock's Contracts with Plans, as well as supplemental disclosure forms, purport to disclose the compensation it receives in connection with

6

these activities.  App.1-1 (Contract) at 13–19; App.110-11 (RKA) at 2–5;

App.1-2 (Supplemental Information Guide) at 3–5, 11–12.  The Contract

contains the following important provision concerning Hancock's use of

"credits" to reduce the Annual Maintenance Charge ("AMC") for its

services:

> The revenue sharing as well as the **credits** that the
> Company receives in respect of an underlying
> investment vehicle affiliated with the Company are
> sometimes generically referred to as "revenue from
> underlying fund." The amount of revenue received by
> the Company from the underlying vehicle varies from
> Fund to Fund. The Company uses **all** revenue received
> from the underlying mutual fund, trust or portfolio to
> reduce the AMC for the Sub-account such that the sum
> of such revenue from the underlying mutual fund, trust
> or portfolio and the AMC is equal to 0.60% of your
> Contract assets invested in each Sub-account.

App.339, ¶ 45 (emphasis added).   None of the Plan documents or

disclosures that Hancock provides to Plans or participants discloses that

it receives and retains substantial foreign tax credits from the mutual

fund shares owned in the Separate Accounts.  Doc.266-3 (Hamilton Dep.)

at 70:1–9, 70:20–71:11; App.266, ¶ 23.

### 2. Hancock's Undisclosed Retention of Foreign Tax Credits.

The Internal Revenue Code (the "Code") taxes all income of U.S.

taxpayers earned worldwide. 26 U.S.C. § 61(a). To avoid double taxation

of a U.S. taxpayer's income earned abroad—by the country in which it was earned as well as the United States—the "foreign tax credit" regime was established.  Under the regime, when a U.S. taxpayer pays income tax to another country due to its business activities in that country, the taxpayer can claim a dollar-for-dollar credit against its U.S. tax liability for the foreign taxes paid.  26 U.S.C. §§ 901-909.  This "foreign tax credit" then mitigates double taxation by offsetting the taxpayer's U.S. taxable income and reducing its overall tax bill.

The Code permits certain regulated investment companies, such as mutual funds, to pass through tax credits to their shareholders.  *See* 26 U.S.C. § 853.  Many mutual funds that invest in foreign stocks and fixed income securities, including a number of mutual funds available on Hancock's Signature platform ("International Investment Options"), elect to operate under this provision and pass through foreign tax credits to their shareholders.  Doc.266-11 (Alvino Dep.) at 43:10–44:10.  Since Hancock is the technical owner of the shares of International Investment Options—which are purchased with assets from and held for the benefit of the Plans—Hancock receives the passed-through foreign tax credits

8

("FTCs") from such mutual funds. *Id.* at 40:13–24, 41:9–13, 43:10–44:10; Doc.272-2 (Carlson Dep.) at 21:17–22:16.

Thus, even though the Separate Accounts are comprised of the assets of retirement plans and those assets effectively pay the foreign taxes that generate FTCs, Hancock is the entity that receives such FTCs. App.339, ¶ 92; App.266, ¶¶ 79, 96. Hancock, however, does not pass through any benefit of the FTCs to the Plans, whose assets are reduced by the amount of the paid foreign taxes, despite Hancock's disclosures and Contract language requiring it to offset the cost of recordkeeping services with the compensation it receives. Doc.266-5 (Holden Dep.) at 50:21–51:14; Doc.266-11 (Alvino Dep.) at 83:20–84:11; App.339, ¶ 101. Nor does it disclose to Plans or participants the substantial benefits it receives from FTCs. Doc.266-3 (Hamilton Dep.) at 70:1–9, 70:20–71:11. But Hancock does treat FTCs like other assets it owns, as it includes an entry for FTCs that are carried forward on its balance sheet. App.266, ¶ 90.

From 2013 to 2019, these undisclosed, retained benefits from FTCs generated from the Plans were material to Hancock's earnings. Doc.266-11 (Alvino Dep.) at 61:8–25; App.339, ¶ 93-b. In total, Hancock received

9

more than $130 million in FTCs from the Plans' investments during that time.  Doc.266-10 (Wang Dep.) at 117:17–119:21; Doc.272-2 (Carlson Dep.) at 88:17–89:20; Docs.266-15–20 (annual spreadsheets).  Hancock then used these FTCs to reduce its overall U.S. tax liability by tens of millions of dollars.  Doc.266-21 (Stipulation); Doc.266-11 (Alvino Dep.) at 50–59; 61:8–25; Doc.266-10 (Wang Dep.) at 51–68; Ex. 272-8 (Mukamal Rept.).[5]

In general, FTCs increased Hancock's post-tax earnings by approximately $15 million to $20 million per year.  Doc.272-4 (Subbaraman Dep.) at 84:9–15; App.339, ¶ 82-c.  Factoring in the cost of utilizing the FTCs and prejudgment interest, Plaintiffs' expert, Barry Mukamal, calculated that the monetary value to Hancock of the FTCs from 2013 through 2019 exceeded $90 million.  Doc.272-8 (Mukamal Rept.) at Tables 4–5, Supp. Table; App.339, ¶ 105.

---

[5] When Hancock was unable to utilize FTCs in certain years, it was permitted to carry forward the FTCs up to ten years.  Doc.266-11 (Alvino Dep.) at 29:8-17; Doc.272-2 (Carlson Dep.) at 30:8-12; Ex. 272-8 (Mukamal Rept.).

### 3. Hancock's Uniform Conduct Towards Plaintiffs.

Every relevant aspect of Hancock's challenged conduct is uniform with respect to the Class. The two agreements that Hancock enters into with retirement plans—a group annuity contract and a recordkeeping agreement—are standardized form contracts generated by a computer program. Doc.266-3 (Hamilton Dep.) at 24:9–25:12, 45:4–21, 50:11–51:3, 53:11–19, 54:2–8, 60:7–61:21; Doc.266-2 (Cobey Dep.) at 68:14–23. None of the documents disclose that Hancock receives and retains FTCs generated by the retirement assets placed in its Separate Accounts. Doc.266-3 (Hamilton Dep.) at 70:1–9, 70:20–71:11, 78:7–17; 266-2 (Cobey Dep.) at 128:6–9; Doc.94-6. Nor do any of the standardized disclosures disseminated to Plans and participants. *Id.* The management and administration of Hancock's Separate Accounts are likewise the same across all retirement plans. Doc.266-5 (Holden Dep.) at 48:16–49:16, 76:18–77:3. Hancock controls the accounting and recordkeeping aspects of transactions involving Plan assets. *Id.* at 48:8–13. And Hancock treats all retirement plans the same with respect to foreign tax credits—it retains the credits generated by the assets of all plans and refuses to pass

11

through benefits to any plans. *Id*. at 47:3–48:11, 50:21–51:14; Doc.266-11 (Alvino Dep.) at 90:20–91:17.

Hancock does "not consult with the trustee [of a retirement plan]" when it decides to not credit the benefit of FTCs to Separate Accounts. Doc.266-5 (Holden Dep.) at 75:18–77:12. This is because Hancock "assume[s] responsibility" for the "day-to-day administration of the separate accounts." *Id*. at 77:14–21. Hancock has direct access to and authority over the assets in the Separate Accounts. *Id*. at 78:19–79:4.

**B.    Procedural History**

Plaintiffs filed a class action complaint against Hancock on March 25, 2019, asserting two claims: first, that Hancock breached its fiduciary duties under ERISA; and second, that Hancock engaged in ERISA prohibited transactions. App.1. Hancock answered the complaint on May 3, 2019. App.25. On May 16, 2019, the parties consented, under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, to the jurisdiction of United States Magistrate Judge Jonathan Goodman for all proceedings and entry of judgment. App.26. Accordingly, the action was referred to Magistrate Judge Goodman the next day. App.27.

12

After conducting extensive discovery, Plaintiffs moved for class certification on July 26, 2021 (Doc.94 (redacted version); Doc.103 (unredacted filed under seal)); Hancock responded on August 9, 2021 (Doc.109); and Plaintiffs replied on August 20, 2021 (Doc.115 (redacted); Doc.120 (unredacted filed under seal)). The court held a hearing on class certification on October 6, 2021 (Doc.149), and it entered an order granting class certification on December 23, 2021 (Doc.295 (unredacted under seal); App.307 (redacted version)). The court clarified the start-date of the class on January 13, 2022. App.306.

The class certified under Fed. R. Civ. P. 23(b)(3) is defined as:

> All trustees of all defined-contribution employee benefit plans covered by [ERISA] with which [John] Hancock had group annuity contracts and recordkeeping agreements from at any time from March 25, 2013, the date of class certification, and that have, since March 25, 2013, allocated assets through [John] Hancock's Signature Platform to International Investment Options that have passed through foreign tax credits to [John] Hancock.

App.306 at 7; App.307 at 15, 56. The court also appointed Eric Romano and Todd Romano as class representatives, and the firms of Podhurst Orseck, P.A. and Searcy Denney Scarola Barnhart & Shipley, P.A. as class counsel. App.307 at 56.

13

The court approved a notice procedure to disseminate Rule 23 notice to the class and provide class members with the right to opt out. Doc.315. The notice administrator implemented the court-approved notice procedure. Doc.342. The notice was mailed to 61,197 class members on March 15, 2022, and 80 requests for exclusion were submitted by the deadline of April 29, 2022. Doc.342-1, ¶¶ 5, 13.

Meanwhile, Hancock moved for summary judgment on November 8, 2021 (Doc.175; Doc.177; App.213 (amended motion); App.214 (amended statement of facts)); Plaintiffs responded on November 22, 2021 (Doc.203 (redacted response); Doc.204 (redacted statement of facts); App.225-1 (unredacted response); App.225-2 (public statement of facts)); and Hancock replied on December 2, 2021 (App.233 (reply); App.235 (statement reply)).[6] The court held a hearing on January 24, 2022 (Doc.313), and it entered an order granting Hancock's motion for summary judgment on May 2, 2022 (Doc.331 (unredacted order under seal); App.339 (redacted order)).

---

[6] To make the docket more organized and accessible, the court ordered the parties to re-file summary judgment submissions, as well as pending *Daubert* motions (Doc.247), which the parties did on December 14, 2021 (Docs.254-92).

14

In its order, the court concluded that, as a matter of law, Hancock was not an ERISA fiduciary for the conduct subject to Plaintiffs' claims, which entitled Hancock to summary judgment. App.339 at 41–65. This conclusion led the court to also rule that Hancock did not breach ERISA fiduciary duties or engage in ERISA prohibited transactions (*id.* at 65–73); that Plaintiffs failed to establish loss causation (*id.* at 73–77); and that Plaintiffs lacked standing (*id.* at 77–82).

The court entered final judgment against Plaintiffs in accordance with its ruling on summary judgment on June 22, 2022. App.351. Plaintiffs filed a notice of appeal on July 15, 2022. App.352.

## SUMMARY OF ARGUMENT

Hancock profited from more than one hundred million dollars in FTCs, even though it did not pay a penny of the underlying foreign taxes. That burden fell solely on Plaintiffs. Such a result may comply with the tax Code, but it violates the strict fiduciary obligations of ERISA. The district court's ruling to the contrary is erroneous and should be reversed.

The primary error in the district court's order is its conclusion that Hancock was not an ERISA fiduciary when it received and profited from

15

FTCs generated by Plaintiffs' investments.   Contrary to the court's analysis, Hancock was an ERISA fiduciary for two independent reasons.

First, FTCs qualify as assets of the Plans, so Hancock's undisputed control over the disposition of the FTCs makes Hancock a fiduciary.  The district court reached the opposite conclusion because it misread important language in the Contract and failed to follow the prevailing approach for determining plan assets.

Second, Hancock's challenged handling of FTCs arises from its discretionary authority over the administration and management of the Plans, in particular, the Separate Accounts.  The district court reached the opposite conclusion because it incorrectly divided the challenged conduct into indecipherable pieces, relied on several inapplicable decisions from other circuits, and gave undue weight to disclaimers that have no legal effect.

The district court's error as to Hancock's fiduciary status plagued its subsequent rulings on breach of fiduciary duty, loss causation, and standing.  If, as the law and record require, Hancock is an ERISA fiduciary for Plaintiffs' claims, there is more than sufficient evidence in the record to create a genuine dispute of material fact as to whether

Hancock breached its fiduciary duties and engaged in prohibited transactions; whether Hancock's misconduct deprived Plaintiffs of more than $90 million; and whether Plaintiffs satisfy the requirements of Article III standing.

For these reasons and those explained below, the district court's order on summary judgment should be reversed, and the case should be remanded for trial.

## STANDARD OF REVIEW

This Court reviews *de novo* both standing and summary judgment. *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1169 (11th Cir. 2006). Summary judgment is appropriate when there exists no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## ARGUMENT

Plaintiffs asserted two claims against Hancock under the civil remedy provision of ERISA § 502, 29 U.S.C. § 1132. First, Plaintiffs asserted that Hancock breached its fiduciary duties under ERISA § 404(a), which requires a fiduciary to discharge its "duties with respect to a plan solely in the interest of the participants and beneficiaries and (A)

for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) deferring reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). In profiting from FTCs without passing through a commensurate benefit to Plans that generated such credits, Hancock failed to act solely in the best interest of the Plans and failed to defray reasonable expenses of administering the Plans.

Second, Plaintiffs asserted that Hancock engaged in prohibited transactions under ERISA § 406, which forbids a fiduciary from "deal[ing] with the assets of the plan in his own interest or his own account." 29 U.S.C. § 1106(b)(1). In retaining the full benefit of the FTCs generated by the Plans' investments, Hancock dealt with the assets of the Plans for its own account.

If Plaintiffs establish that Hancock was acting as a fiduciary and breached its fiduciary duties or engaged in prohibited transactions, Hancock is

> personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.

29 U.S.C. § 1109(a).

As explained below, Plaintiffs submitted more than sufficient evidence at summary judgment to sustain these claims. The district court erred in ruling to the contrary.

## I.    THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFFS LACK STANDING TO ASSERT THEIR ERISA CLAIMS.

Although the district court reached the issue of standing at the end of its order (App.339 at 77-82), we begin with standing because it is jurisdictional. *See Lewis v. Governor of Alabama*, 944 F.3d 1287, 1296 (11th Cir. 2019) ("Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting."). Plaintiffs have standing because they seek compensation for a monetary loss resulting from Hancock's alleged violation of ERISA. Plaintiffs' claims assert that Hancock's disloyal conduct earned it more than $90 million that should have been credited to class members. Such a monetary loss, the Supreme Court has held, is "a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). And the claims that Plaintiffs have asserted—for breach of

fiduciary duty—have "traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). This is more than sufficient to establish standing.

The district court reached the opposite, erroneous conclusion because it confused standing with the merits of Plaintiffs' claims. Indeed, the court recognized that, at class certification, when it had assumed that Plaintiffs would prevail, it had also determined that Plaintiffs had standing. App.339 at 78. It was required to make the same assumption regarding the merits of Plaintiffs' claims at summary judgment. *See Warth v. Seldin*, 422 U.S. 490, 500, 502 (1975) (assuming the factual validity and legal sufficiency of the plaintiffs' claims in addressing Article III standing); *Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.") (internal quotation marks omitted); *accord Comm. on Judiciary of United States House of Representatives v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (*en banc*) ("When

determining whether a plaintiff has Article III standing, the court must assume that the Committee will prevail on the merits.").

The district court's error is evident from its statement that Plaintiffs "could not use the FTCs[,] and their Plan's contractual entitlement was to assets valued using a mutual fund's NAV—which is set net of foreign taxes." App.339 at 81. This is a merits-based conclusion, declared only after the court erroneously rejected Plaintiffs' claim that the Contract and fiduciary obligations arising from ERISA entitled Plaintiffs to the monetary value of the FTCs.

The district court relied on *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1000 (11th Cir. 2020), but that decision is inapplicable. *Trichell* involved a statutory claim that alleged a purely informational injury, not a concrete monetary loss. *Id.* at 1003-05. Plaintiffs here have alleged a substantial monetary loss.

Likewise, the district court's reliance on *Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561 (2d Cir. 2016), is misplaced. The plaintiffs in *Trustees*, a case arising from the Bernie Madoff fraud, suffered "no cognizable investment loss" because they withdrew more money from the fraud than they lost, and thus were

21

"net winners" from the fraud. *Id.* at 565, 569. The decision does not suggest that a monetary loss of non-fraudulent assets from an alleged fiduciary breach fails to satisfy Article III.

The district court also relied on *Thole v. U.S. Bank N.A*, 140 S. Ct. 1615 (2020), but that decision is inapplicable because Plaintiffs clearly have a "concrete stake in this lawsuit," and thus have standing. *Id.* at 1619. Unlike the defined-benefit plan in *Thole*, the Plans here are a defined-contribution plans, and judgment for Plaintiffs will result in a payment from Hancock to Plaintiffs of more than $90 million, with prejudgment interest. These "monetary injur[ies]" suffered by Plaintiffs and the class "readily qualify as concrete injuries under Article III." *TransUnion*, 141 S. Ct. at 2204.

In addition, regardless of whether Plaintiffs can establish damages, Plaintiffs have also sought equitable relief, which includes disgorgement, for Hancock's fiduciary breaches. App.1 at 15-17. The district court's focus on Plaintiffs' monetary loss, therefore, was too limited, because "the nature of disgorgement claims suggest that a financial loss is not required for standing, as a loss is not an element of a disgorgement

claim." *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 415 (3d Cir. 2013).

The district court erred in ruling that Plaintiffs lacked standing. Accordingly, its ruling should be reversed.

## II.   THE DISTRICT COURT ERRED IN CONCLUDING THAT HANCOCK WAS NOT AN ERISA FIDUCIARY FOR PLAINTIFFS' CLAIMS.

A central issue for each of Plaintiffs' claims is whether Hancock qualifies as a fiduciary under ERISA "when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).   Under ERISA, a person or entity attains fiduciary status either by being named a fiduciary in the plan, 29 U.S.C. § 1102(a), or by performing or possessing the authority to perform certain functions, 29 U.S.C. § 1002(21)(A).  Specifically, a person is a so-called functional fiduciary with respect to the plan

> to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*Id.*

23

Thus, "ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (citing 29 U.S.C. § 1002(21)(A)) (emphasis in original).  With this functional approach, "Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993).

In determining whether a defendant qualifies as a fiduciary, "[p]roof of fiduciary status 'may come from the plan document, but can also come from the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation in the plan document.'" *Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 915 (11th Cir. 2022) (quoting *Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 824 (11th Cir. 2001)).

Plaintiffs alleged that Hancock was a functional fiduciary because it exercised authority or control respecting management or disposition of plan assets, and because it had and exercised discretionary authority or responsibility in the administration and management of the Plans.

24

(App.1, ¶¶ 41–42.)  The district court erred in rejecting both claims, either of which is sufficient to support reversal.

>    A.    **Hancock Was an ERISA Fiduciary Because It Exercised Authority or Control Respecting Management or Disposition of FTCs, Which Are Plan Assets.**

There is no serious dispute that Hancock exercised authority or control over the disputed FTCs.  Hancock used the FTCs to reduce its own tax burden, and its corporate representative testified that it never consulted with the Plans about its use of the FTCs.  App.266, ¶ 103.  The dispositive issue for this pathway to fiduciary status, then, is whether the FTCs are plan assets.  If they are, then Hancock is a fiduciary for Plaintiffs' claims. *See Guyan Int'l, Inc. v. Pro. Benefits Adm'rs, Inc.*, 689 F.3d 793, 798 (6th Cir. 2012) ("[A]n entity that exercises any authority or control over disposition of a plan's assets becomes a fiduciary.").  The district court erred in concluding that FTCs are not plan assets.

>    1.    ERISA "contains no comprehensive definition of 'plan assets.'" *John Hancock Mut. Life Ins. Co.*, 510 U.S. at 89.  So, most circuit courts that have considered the issue, guided by the Department of Labor, have defined "'plan assets' consistently with 'ordinary notions of property rights,' including in the definition any funds in which a plan has obtained

a 'beneficial interest.'" *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 647 (8th Cir. 2007) (citing, *e.g.*, U.S. Dep't of Labor, Office of Pension and Welfare Benefit Programs (E.R.I.S.A.), Advisory Op. No. 93–14A, 1993 WL 188473, at *4  (May 5, 1993)); *accord Sec'y U.S. Dep't of Lab. v. Koresko*, 646 F. App'x 230, 238 (3d Cir. 2016); *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56 (1st Cir. 2014); *In re Halpin*, 566 F.3d 286, 289 (2d Cir. 2009); *In re Luna*, 406 F.3d 1192, 1199 (10th Cir.2005).  *But see Patelco Credit Union v. Sahni*, 262 F.3d 897, 908 (9th Cir. 2001) (adopting minority approach).

This property-rights approach to identifying plan assets includes "any property, tangible or intangible, in which the plan has a *beneficial* ownership interest." U.S. Dep't of Labor, Advisory Op. No. 93–14A, 1993 WL 188473, at *4 (emphasis added).  In addition, it includes "any contributions to the Policy Trust, any *earnings on the contributions*, the Group Policy itself, any reserves under the Group Policy, and *any retrospective rate credits* declared under the Group Policy." *Id.* (emphasis added).

To determine whether the plan has a "beneficial interest" in particular funds, courts consider whether representations were made

26

"sufficient to lead participants and beneficiaries of the plan to reasonably believe that such funds separately secure the promised benefits or are otherwise plan assets." *Kalda*, 481 F.3d at 647 (internal quotation marks omitted). Thus, "the first step in identifying the property of an ERISA plan is to consult the documents establishing and governing the plan." *Sec'y of Lab. v. Doyle*, 675 F.3d 187, 204 (3d Cir. 2012); *cf. ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1013 (11th Cir. 2003) ("The proper rule, developed by caselaw, is that unpaid employer contributions are not assets of a fund unless the agreement between the fund and the employer specifically and clearly declares otherwise.").

The district court purported to apply this property-rights test in concluding that FTCs are not Plan assets. App.339 at 61–62. But the court overlooked several important facts, ultimately failing to consider whether Plaintiffs had a "beneficial interest" in FTCs.

**2.** Significantly, the district court skipped "the first step in identifying the property of an ERISA plan"—it failed "to consult the documents establishing and governing the plan" in its plan-asset analysis. *Doyle*, 675 F.3d at 204. The Plan documents vest Plaintiffs with at least a beneficial interest in the FTCs.

27

Plaintiffs' Contract with Hancock provides that "[t]he revenue sharing as well as the *credits* that [Hancock] receives in respect of an underlying investment vehicle affiliated with [Hancock] are sometimes generically referred to as 'revenue from the underlying fund.'" App.266, ¶ 45. The Contract promises Plaintiffs that Hancock

> uses *all* revenue received from the underlying mutual fund, trust or portfolio to reduce the AMC for the Sub-account such that the sum of such revenue from the underlying mutual fund, trust or portfolio and the AMC is equal to 0.60% of your Contract assets invested in each Sub-account.

*Id*. (emphasis added). Because "revenue from the underlying fund" is a defined term that expressly includes "credits that [Hancock] receives," and Hancock promises to apply "*all*" revenue from the underlying fund to offset asset-based charges, the Contract provides Plaintiffs with at least a beneficial interest in such credits.[7] *See Koresko*, 646 F. App'x at 237 (holding that plan documents "manifest[ed] an intent to confer a beneficial interest on participating plans" even though the documents did

---

[7] Whether the Contract provides Plaintiffs with a beneficial interest in FTCs themselves or the contractual right to the equivalent monetary value of the FTCs, the result is the same. Both are assets, and in both instances, Hancock exercised control over the assets by using the FTCs for its own benefit without providing Plaintiffs with equivalent value.

"not confer legal title" to the assets on the plans).

To the extent that the Contract is ambiguous on this point, it must be construed against the drafter, Hancock. *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1307 (11th Cir. 2016) ("[O]nce we conclude a term is ambiguous, the rule of contra proferentem requires us to construe any ambiguities against the drafter. These rules of contract interpretation are generally accepted as part of the federal common law.") (citations omitted); *Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1551 (11th Cir. 1994) ("Having determined that the plan is ambiguous, we hold that application of the rule of contra proferentem is appropriate in resolving ambiguities in insurance contracts regulated by ERISA. This rule has been widely adopted among our sister circuits.").

Additional representations in the Plan documents reinforce Plaintiffs' beneficial interest in FTCs. Hancock sent Plaintiffs various documents, including periodic ERISA 408(b)(2) disclosures, that purported to disclose all the compensation that Hancock earned from serving as Plaintiffs' recordkeeper, as ERISA and its implementing regulations require. *See* 29 U.S.C. § 1108(b)(2)(B)(iii)(III)–(IV) (requiring

the disclosure of "all direct compensation" and "all indirect compensation" that the service provider expects to receive); 29 C.F.R. § 2550.408b-2(c)(1)(iv)(C) (same). "Compensation" is broadly defined in ERISA and the corresponding regulation to mean "anything of monetary value." 29 U.S.C. § 1108(b)(2)(B)(ii)(I)(dd)(AA); 29 C.F.R. § 2550.408b-2(c)(1)(viii)(B). Missing from these Hancock disclosures, however, is any statement indicating that it would receive FTCs—which clearly have "monetary value"—in connection with its recordkeeping services. Doc.266-3 (Hamilton Dep.) at 70:1–9, 70:20–71:11, 78:7–17; 266-2 (Cobey Dep.) at 128:6–9; Doc.94-6. The reasonable inference to be drawn from the glaring absence of such a statement from Hancock's purportedly comprehensive disclosures is that Hancock was not receiving the FTCs as compensation, but instead was passing their benefit to the Plans. Thus, Hancock's various compensation disclosures reinforce Plaintiffs' beneficial interest in the FTCs.

In contrast, not a single statement in the Plan documents indicate that the Hancock would retain the benefit of the FTCs generated from Plaintiffs' investments. The district court erred in failing to consider this stark imbalance in its plan-asset analysis.

**3.** The district court also failed to consider the source of the FTCs, contrary to the Department of Labor's guidance. Plan assets, according to the Department of Labor, include financial benefits generated by and flowing from plan contributions, such as "earnings on the contributions" and "retrospective rate credits." U.S. Dep't of Labor, Advisory Op. No. 93–14A, 1993 WL 188473, at *4.

The Department of Labor reiterated this point in a Technical Release that the district court failed to acknowledge. *See* U.S. Dep't of Labor, Technical Release No. 2011-04 (Dec. 2, 2011).[8] The Department considered rebates or credits provided to an ERISA insurance plan and concluded that even when an employer is the nominal policyholder, "the portion of a rebate that is attributable to participant contributions would be considered plan assets." *Id.* This agency guidance, which is entitled to deference, *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), demonstrates that the plan-asset inquiry cannot stop at the titleholder, but must drill deeper to determine whether an asset nominally held by another entity "is attributable to participant contributions," *see* U.S.

---

[8] Available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/technical-releases/11-04#f3.

Dep't of Labor, Technical Release No. 2011-04.

Under this prevailing approach, Hancock's nominal ownership of the FTCs under the tax Code is not decisive. Rather, the inquiry centers on whether the FTC "is attributable to participant contributions," *id.*, a consideration that establishes FTCs as Plan assets, because they are "attributable" to payments from Plan investments, not Hancock's own assets. App.266, ¶¶ 78–79, 92.

**4.** The district court's plan-asset analysis is at odds with the approach utilized by several circuits and the Department of Labor. The court merely described technical aspects of FTCs—for example, their connection to the tax Code and non-transferability. App.339 at 61–62. It then declared that an FTC "is not analogous to an asset subject to ordinary notions of property rights," App.339 at 62, without considering the source of the FTCs or relevant language of the Plan documents. Indeed, absent from the court's analysis is even a single reference to the central question for the prevailing approach—whether Plaintiffs had a "beneficial interest" in the FTCs.

To be sure, in addressing a different issue later in the opinion, the district court did review Plaintiffs' Contract with Hancock. App.339 at

68–69.  But the court misread the relevant language.  The court described the Contract as referencing "credits from John Hancock related to 'investment management fees paid' to John Hancock affiliates," and it determined that FTCs do not fall within that description.  App.339 at 68.  The decisive flaw in the court's reasoning is that the Contract does not limit "credits" to those "related to 'investment management fees paid.'"  App.266, ¶ 45.  That is the court's language, not the Contract's.

As explained above, the Contract defines the phrase "revenue from the underlying fund" as encompassing "credits that [Hancock] receives in respect of an underlying investment vehicle affiliated with [Hancock]."  App.266, ¶ 45.  It is difficult to understand how FTCs do not fit within this broad definition.  FTCs are "credits"; Hancock "receives" them; and the FTCs are "in respect of" investments held in the Separate Accounts, which are "underlying investment vehicles affiliated with [Hancock]."  *Id.*  The district court reached the wrong conclusion because it construed the wrong language.

The court made a similar mistake in reasoning that "FTCs are not payments and they are not 'receive[d] from the mutual funds.'"  App.339 at 68.  The pertinent language of the Contract does not define "credits"

33

as "payments received from the mutual funds." App.266, ¶ 45. Again, the court replaced the actual language of the Contract with an inaccurate version. The court also failed to appreciate that "revenue from the underlying fund" was a defined term that included the broad description of "credits," so there was no basis for the court to exclude FTCs from Plan assets for not being payments received from a mutual fund.

The district court also relied extensively on an inapplicable section of *Edmonson*, 725 F.3d at 406. App.339 at 64–66. The *Edmonson* plaintiff alleged that the defendant insurer breached ERISA fiduciary duties when the insurer elected to pay life insurance benefits through a retained asset account, the funds of which the defendant invested for its own profit until the plaintiff emptied the account. *Id.* at 420. While the Third Circuit concluded that the insurer's use of a retained asset account made it a fiduciary, since selecting such an account was an exercise of discretion, *id.* at 421–23, the court concluded that the insurer was not a fiduciary for the subsequent investment of the retained asset funds. *Id.* at 426–28. The court reasoned that the insurer had already fulfilled its obligations to the plaintiff, and the funds were not plan assets, as the Department of Labor had submitted a letter supporting that position in

34

a similar case and nothing in the plan or policy documents indicated that the plan had an interest in the retained assets. *Id.* at 426–28.

*Edmonson* emphasized that "whether specific assets are plan assets is ultimately a factual inquiry," *id.* at 428, and the facts of *Edmonson* are nothing like the facts here. Unlike the retained asset account, which was created only after an insurer had fulfilled its obligations to pay a life insurance claim, *id.* at 427–28, the FTCs arose throughout a continuing relationship between Hancock and Plaintiffs. Further, unlike the plan documents in *Edmonson*, which contained no evidence that the plan retained an ownership interest in the retained assets that were already awarded to a particular participant, *id.* at 428, the Plan documents here do indicate that Plaintiffs have a beneficial interest in the FTCs. And unlike *Edmonson*, the Department of Labor has not argued against a plan-asset finding. Given these significant factual differences, the district court erred in relying on *Edmonson*'s plan-asset ruling.

B.   **Hancock Was an ERISA Fiduciary Because It Had and Exercised Discretionary Authority or Control Over Management and Administration of the Plans.**

An independent source of Hancock's fiduciary status, regardless of whether FTCs are plan assets, is Hancock's management and

administration of the plans. Hancock's challenged conduct—its retention of the full benefit of FTCs generated by Plaintiffs' investments—arises from its discretionary authority or control over the management and administration of the Separate Accounts.

**1.** Hancock conceded its fiduciary status in the RKA, representing that it was a "limited fiduciary for the exclusive purposes of holding plan assets in its separate accounts." App.256, ¶ 40. This concession is unsurprising, for ERISA regulations specify that assets placed in separate accounts are plan assets. 29 C.F.R. § 2510.3-101(h)(1)(iii). ERISA regulations also clearly establish that insurers like Hancock are fiduciaries with respect to the assets placed in separate accounts:

> In general, an insurer is subject to ERISA's fiduciary responsibility provisions with respect to the assets of a separate account (other than a separate account registered under the Investment Company Act of 1940) to the extent that the investment performance of such assets is passed directly through to the plan policyholders. ERISA requires insurers, in administering separate account assets, to act solely in the interest of the plan's participants and beneficiaries; prohibits self-dealing and conflicts of interest; and requires insurers to adhere to a prudent standard of care.

29 C.F.R. § 2550.401c-1. And Hancock's employees testified that Hancock exercised control over the movement of funds within the separate

accounts—for example, by crediting accounts to reflect the investment performance of underlying mutual funds. App.266, ¶¶ 100–03. This Court recently held that performing similar functions rendered a defendant a fiduciary under ERISA. *See Gimeno*, 38 F.4th at 915 (holding that employer that deducted premiums for insurance coverage from paycheck was a fiduciary).

As Hancock was a fiduciary "in administering separate accounts," or "holding plan assets in its separate accounts," the question is whether Plaintiffs' claims arise from Hancock's performance of these "fiduciary functions." *Pegram*, 530 U.S. at 226. The clear answer is that they do. By virtue of performing these fiduciary functions—i.e., "holding plan assets in its separate accounts" (App.256, ¶ 40; Doc.110-10 (RKA) at 2)— Hancock receives the FTCs at the center of this dispute. App.266, ¶¶ 78– 79, 92. Its receipt of such FTCs, combined with its refusal to credit the Plan assets held in its separate accounts with a commensurate benefit— all of which it controls as a fiduciary—is the "action subject to complaint." *Pegram*, 530 U.S. at 226.

Moreover, the evidence demonstrates that Hancock has and exercises discretion performing its fiduciary functions. In the context of

ERISA, "[d]iscretion exists where a party has the power of free decision or individual choice," as opposed to merely performing functions "which by their nature are inherently ministerial, such as clerical services" or "which are performed [solely] within the confines of plan policies and procedures." *David P. Coldesina, D.D.S. v. Est. of Simper*, 407 F.3d 1126, 1132 (10th Cir. 2005) (internal quotation marks omitted). When a party's relationship with an ERISA-covered plan gives the party sufficient "control over factors that determine the actual amount of its compensation . . . the person thereby becomes an ERISA fiduciary with respect to that compensation." *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987).[9] That is the case here.

As Hancock's witnesses testified, Hancock has complete control over the disposition and management of the FTCs.  App.266, ¶¶ 99–103. Hancock does not consult with the Plan regarding the management of FTCs (App.266, ¶ 103), and thus Hancock has discretion, or "the power of free decision or individual choice," with respect to the FTCs, *David P.*

---

[9] *See also Golden Star, Inc. v. Mass Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 81 (D. Mass. 2014) ("The caselaw is clear that a service provider's retention of discretion to set compensation can create fiduciary duties under ERISA with respect to its compensation.").

*Coldesina, D.D.S.,* 407 F.3d at 1132. And Hancock's own internal reporting documents demonstrate that it treats FTCs as a component of its RPS compensation, which it tracks on a quarterly and annual basis and projects years into the future. App.266, ¶¶ 82–84. Because Hancock's relationship with the Plan gives it complete control over the FTC component of its RPS compensation (*id.*), it is a fiduciary with respect to the FTCs. *See F.H. Krear & Co.*, 810 F.2d at 1259.

The Second Circuit's decision in *Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18 (2d Cir. 2002), is instructive on this point. In that case, the court held that, because Hancock's contract with a plan did not specify "how it would allocate the returns on its investments and its expenses among its various client accounts such as the [p]lan," Hancock was a fiduciary "with respect to its investment and allocation decisions," because "such transactions represent the quintessential 'discretionary management' decisions that ERISA seeks to protect." *Id.* at 31. So too here. Neither the Contract nor the RKA specifies how Hancock will allocate the FTCs generated from the Plan's investments, and thus Hancock's allocation decisions regarding such FTCs "represent the quintessential 'discretionary management' decisions

that ERISA seeks to protect." *Id.*[10]

2.   The district court reached the opposite conclusion by erroneously chopping the challenged conduct into unrecognizable pieces.  App.339 at 44–45.  The court analyzed whether Hancock is "an ERISA fiduciary for preparing its taxes and using the FTCs available to it (but not to Plaintiffs)." *Id.* at 44.  But, contrary to the court's framing, FTCs are not free-floating products of Hancock's unrelated "business functions." *See id.*  Rather, FTCs arise directly from the deduction of foreign taxes from the Plan's investments, and then flow to Hancock only because of its fiduciary role in holding the Plan assets.  App.266, ¶¶ 79, 88-89, 92, 96, 99–104.  The application of FTCs to Hancock's corporate taxes is not an independent act that can be separated from their source—Plaintiffs' investments.

---

[10] *See also Peters v. Aetna Inc.*, 2 F.4th 199, 231 (4th Cir. 2021) (reversing summary judgment for defendant and holding that "[a] reasonable factfinder could conclude that [the challenged] administrative fee was therefore imposed upon [the plaintiff] at [the defendant's] discretion, but without authority under the Plan and in direct violation of the [contract with defendant]"); *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, 961 F. Supp. 2d 393, 403 (D. Conn. 2013) ("Given the material dispute regarding whether ILIAC's revenue-sharing practices are within the scope of its fiduciary duty, summary judgment on these counts is inappropriate.").

The entire picture and transaction—from the Plan's payment of foreign taxes that generate the FTCs, to Hancock's refusal to provide a commensurate benefit to the Plans—should be considered. If, for example, a fiduciary stole funds from a plan and deposited the funds in his own account, it would be nonsensical to argue that only the last step in the process—depositing the funds in the thief's account—should be viewed in isolation, while ignoring the source of the funds. So too here, Hancock's use of the FTCs cannot be evaluated in isolation from the source of the funds and from Hancock's refusal to transfer a commensurate benefit to the Plans. The source matters.

The court also reasoned that FTCs are "uniquely creatures of the federal tax law." App.339 at 45. But that is a non sequitur. FTCs do not arise from the tax law alone. The payment of foreign taxes is an equally essential element, and it is the investments of the Plans, not Hancock, that ultimately are responsible for such tax payments. Like tax credits, securities are the product of both a legal framework and financial payments. The legal structure of securities, however, does not strip them of protection under ERISA. Nor does the legal foundation of FTCs strip them of ERISA protection.

41

The district court relied on *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1283 (11th Cir. 2012), but the reasoning of that decision actually supports Plaintiffs' claims. In *Lanfear*, the Court held that corporate officers were not acting as ERISA fiduciaries when they made inaccurate statements about the business in documents filed with the SEC. *Id.* The Court rejected the plaintiff's argument that the "inaccurate statements were transformed from misrepresentations in an SEC filing into 'fiduciary communications'" when the SEC filings were provided to the company's employees. *Id.* Here, the district court's order engages in an impermissible transformation in reverse: from taking a fiduciary act— i.e., holding the Plan assets—to a non-fiduciary business function of completing its taxes. The logic of *Lanfear* precludes this transformation. And unlike the securities filings in *Lanfear*, which the company would have been required to submit to the SEC regardless of any ERISA fiduciary functions, the FTCs here would not have flowed to Hancock but for its ERISA fiduciary functions—they would not exist but for the Plan entrusting its investments to Hancock with the assurance that Hancock would treat them as an ERISA fiduciary would.

42

**3.**  The district court also relied on a series of superficially similar decisions that are, in fact, distinguishable in key respects.  App.339 at 46–47.  The similarity is that they involve ERISA claims against insurers that, like Hancock, administered group annuity contracts.  *Id.*  But they are inapplicable because, in each case, the insurer's challenged conduct either was expressly authorized in the insurer's contract with a retirement plan, or was subject to negotiations with and controlled by the retirement plan.  *See Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 840–41 (9th Cir. 2018) (holding that insurer was not a fiduciary "when withdrawing precise, *preset* fees from the pooled accounts," which was "in strict adherence to [a] *contractual* term") (emphasis added); *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1003 (8th Cir. 2016) (holding that "a service provider's adherence to its *agreement* with a plan administrator does not implicate any fiduciary duty where the parties negotiated and agreed to the terms of that *agreement* in an arm's-length bargaining process") (emphasis added); *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 295–97 (3d Cir. 2014) (holding Hancock was not a fiduciary because the plan "trustees still exercised *final authority* over what funds would be

included" and "*ultimate authority* still resided with the trustees") (emphasis added); *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 911 (7th Cir. 2013) (holding that insurer was not a fiduciary because it "never exercised this contractual right in a way that could give rise to a claim," and thus there was no difference from a prior case in which he retirement plan had "the *final say* on which investment options will be included") (emphasis added).[11]

As established above, nothing in the Contract or RKA—not a single word—authorizes Hancock to retain the benefit of FTCs without passing on a commensurate benefit to the Plan (App.266, ¶ 23), so *McCaffree*, 811 F.3d at 1003, and the Ninth Circuit's *Santomenno* decision, 883 F.3d at 840–41, are inapplicable as well. Likewise, Hancock exercises complete control over FTCs, which are not the subject of arms-length or any negotiations, so *Leimkuehler*, 713 F.3d at 911, and the Third Circuit's *Santomenno* decision, 768 F.3d at 295–97, are inapplicable. Other courts

---

[11] In fact, *Leimkuehler* supports Plaintiffs' claim, because it acknowledged that claims for improperly diverting assets from a separate account for the benefit of an insurer would have a sufficient nexus to an insurer's "control over the separate account . . . to support a finding of fiduciary status." 713 F.3d at 913. That is, of course, what Plaintiffs allege and establish here.

have distinguished the same line of authority for the same reasons. *See Rozo v. Principal Life Ins. Co.*, 949 F.3d 1071, 1074 (8th Cir. 2020) (holding that the same decisions were "inapposite" because the challenged "provider's act was contractually predetermined"); *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (holding that "[s]uch cases are inevitably fact intensive, and the courts in the cited cases carefully limited their decisions to the facts presented").

In addition, the Supreme Court's recent decision in *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022), calls into question the reasoning of *Leimkuehler*, 713 F.3d at 911, the Third Circuit's *Santomenno* decision, 768 F.3d at 295–97, and the Seventh Circuit's earlier decision in *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). The Supreme Court ruled that the "Seventh Circuit erred in relying on the participants' ultimate choice over their investments to excuse allegedly imprudent decisions" by the fiduciary defendant. *Hughes*, 142 S. Ct. at 742. Thus, the Supreme Court rejected the lower court's reasoning that the challenged conduct—the amount of fees paid—"were within the participants' control." *Id.*

*Hughes* similarly undercuts the district court's "exclusive focus on

45

investor choice." *Id.* The district court reasoned that "[t]he FTCs arose from *Plaintiffs'* acts and choices," and that Plaintiffs "selected the funds." App.339 at 51–52. But under *Hughes*, Plaintiffs' "ultimate choice over their investments" does not "excuse" Defendants' fiduciary violations. 142 S. Ct. at 742.

To be sure, as the district court recognized (App.339 at 47, 50) and this Court has held, fiduciary status may not attach to conduct of an insurer that complies with "a pre-existing framework of policies, practices and procedures." *Useden v. Acker*, 947 F.2d 1563, 1575 (11th Cir. 1991). But that agreed-upon "framework of policies, practices and procedures" is precisely what is absent here. Like the insurers in the inapt decisions upon which the district court relied, Hancock could have negotiated an arms-length contract with the Plan that authorized it to keep FTCs. *See Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337-CIV.-JORDAN, 2007 WL 2263892, at *35 (S.D. Fla. Aug. 7, 2007), as amended (Aug. 10, 2007) ("[I]nsurers are free to contract with their plan customers—even where the contract is for the performance of fiduciary functions—on an arm's length basis that does not implicate ERISA's fiduciary standards."). But Hancock elected not to do so, so it cannot avoid

46

the fiduciary obligations that its unauthorized, discretionary conduct creates.

**4.** Finally, the district court relied on language from the Contract and RKA in which Hancock disclaimed fiduciary responsibility. (App.339 at 53–57.) But "language in a contract purporting to limit fiduciary status does not 'override[ ] [a third-party administrator's] functional status as a fiduciary.'" *Guyan Int'l,* 689 F.3d at 798 (quoting *Briscoe v. Fine*, 444 F.3d 478, 492 (6th Cir.2006)). This Court has repeatedly reaffirmed this principle. *See, e.g., Gimeno*, 38 F. 4th at 915 (holding that "factual circumstances surrounding the administration of the plan" will determine whether a defendant is a fiduciary, "even if these factual circumstances contradict the designation in the plan document") (quoting *Hamilton*, 244 F.3d at 824); *Rosen v. TRW, Inc.*, 979 F.2d 191, 193–94 (11th Cir. 1992) ("[W]e hold that if a company is administrating the plan, then it can be held liable for ERISA violations, regardless of the provisions of the plan document."). The district court overlooked these authorities in placing undue emphasis on Hancock's ineffective disclaimers.

## III.  THE DISTRICT COURT ERRED IN CONCLUDING THAT HANCOCK DID NOT BREACH ITS ERISA FIDUCIARY DUTIES.

The district court's ruling that Hancock did not breach any ERISA fiduciary duties or engage in prohibited transactions depends on its erroneous conclusion that Hancock was not an ERISA fiduciary for Plaintiffs' claims.  Reversing the fiduciary ruling also requires reversal of the breach ruling.

**1.**  ERISA imposes a broad duty of loyalty on fiduciaries. *See* 29 U.S.C. § 1104(a). The statute provides, in pertinent part, that

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan[.]

*Id.*  This duty of loyalty requires ERISA fiduciaries to act with "'an eye single' toward beneficiaries' interests." *Pegram*, 530 U.S. at 235 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)). "Perhaps the most fundamental duty of a [fiduciary] is that he must display . . . complete loyalty to the interests of the beneficiary and must exclude all

48

selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

The duty of loyalty is "blatantly violated" when a fiduciary uses assets of the plan "for its own purposes." *Guyan Int'l*, 689 F.3d at 798; *see Felber v. Estate of Regan*, 117 F.3d 1084, 1086–88 (8th Cir. 1997) (finding breach of fiduciary duties under ERISA §§ 404 and 406 where trustee of ERISA plan engaged in self-dealing and imprudent transactions). Thus, if the FTCs are Plan assets, Hancock breached its fiduciary duties by using those assets to reduce its own tax exposure—for its own purpose. Likewise, if ERISA's fiduciary obligations governed Hancock's administration and management of the FTCs, Hancock's retention of the full monetary value of the FTCs without providing Plaintiffs with an equivalent benefit was inconsistent with its duty to discharge its responsibilities "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a).

2.    The district court's contrary conclusion rests on its prior, erroneous ruling that Hancock did not owe ERISA fiduciary duties to Plaintiffs and that the Contract did not require Hancock to utilize FTCs to defray Plan expenses. App.339 at 67–70. The court reasoned, for

example, that Hancock "complied with U.S. tax law and the Contract and RKA." *Id.* at 67. But complying with U.S. tax law is beside the point; tax-law compliance is no more a defense to a claim that Hancock violated ERISA, a different statute, than complying with the speed limit is a defense to a charge of assault. And the district court's conclusion that Hancock complied with the Contract and RKA is incorrect, resting on its misreading of the Contract, as explained earlier.

In either event, Plaintiffs have not asserted a mere breach-of-contract claim. As the Supreme Court explained,

> There is more to plan (or trust) administration than simply complying with the specific duties imposed by the plan documents or statutory regime; it also includes the activities that are 'ordinary and natural means' of achieving the 'objective' of the plan. Indeed, the primary function of the fiduciary duty is to constrain the exercise of discretionary powers which are controlled by no other specific duty imposed by the trust instrument or the legal regime. If the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose.

*Varity Corp. v. Howe*, 516 U.S. 489, 504 (1996) (emphasis and internal quotation marks omitted). The district court's reduction of the breach-of-fiduciary-duty claim to a question of whether Hancock "compl[ied] with

the specific duties imposed by the plan documents" is inconsistent with the duties imposed by ERISA. *Id.*

This legal error gave rise to the district court's erroneous conclusion that there was "no record evidence that Hancock had a subjectively disloyal intent." App.339 at 67. That conclusion is also inconsistent with the summary judgment evidence, viewed in the light most favorable to Plaintiffs, as it must be at this stage.

The summary judgment evidence clearly establishes that Hancock's challenged conduct—utilizing FTCs without providing the Plan with a commensurate benefit—advances Hancock's interests to the exclusion of those of the Plan. It should be uncontroversial that "the court may rely on 'circumstantial evidence and reasonable inferences' to determine whether a defendant was 'attempting to also satisfy [its own] desires and needs'" when taking a challenged action. *Hugler v. Byrnes*, 247 F. Supp. 3d 223, 230 (N.D.N.Y. 2017) (quoting *Davidson v. Cook*, 567 F.Supp. 225, 236 (E.D. Va. 1983)). The "circumstantial evidence" from which reasonable inferences must be drawn in Plaintiffs' favor includes Hancock's quarterly and annual financial reporting documents, which are distributed to business unit leaders, to precisely track the "benefit"

51

Hancock receives from FTCs. App.266, ¶¶ 82–84. Hancock's retention and utilization of this benefit is no accident. It is material to Hancock's earnings. *Id.*, ¶ 93. This evidence alone is sufficient to defeat summary judgment.

**3.** This evidence also establishes that the court erred in granting Hancock summary judgment on Plaintiffs' prohibited transaction claim. Section 406 of ERISA, 29 U.S.C. § 1106, "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed likely to injure the pension plan." *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000) (internal quotation marks omitted). Liability attaches under this section "even where there is 'no taint of scandal, no hint of self-dealing, no trace of bad faith.'" *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987) (quoting *Cutaiar v. Marshall*, 590 F.2d 523, 528 (3d Cir.1979)). Plaintiffs brought claims under both §§ 1106(b)(1) and 1106(b)(3), but limit this appeal to § 1106(b)(1), which prohibits a plan fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."

The district court determined that Plaintiffs' claim did not meet the

requirements of § 1106(b)(1) because of its prior ruling that FTCs are not ERISA plan assets. App.339 at 71. But as explained above, that ruling is erroneous, and thus so too is the court's dismissal of Plaintiffs' § 1106(b)(1) claim. The evidence establishes that Hancock used more than $100 million in FTCs to reduce its own tax liability. Doc.272-3 (Alvino Dep.) at 16:7–17:22, 36:20–24, 46:9–13; Doc.266-21 (stipulation). Such evidence more than suffices to establish a violation of § 1106(b)(1). *See Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan*, 722 F.3d 861, 868 (6th Cir. 2013) ("Where a fiduciary uses a plan's funds for its own purposes . . . such a fiduciary is liable under § 1104(a)(1) and § 1106(b)(1).").

## IV. THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFFS DID NOT ESTABLISH LOSS CAUSATION.

The district court's conclusion that Plaintiffs did not prove loss causation also rests on its erroneous prior rulings that Hancock was not an ERISA fiduciary and did not breach its fiduciary duties. App.339 at 75–77. This is evident from the court's observation that Plaintiffs' theory of loss causation "depends on John Hancock owing a fiduciary duty to Plaintiffs concerning the FTCs, which the undersigned has already

determined does not exist." *Id.* at 75.  Reversal of the fiduciary ruling, therefore, will also require reversal of this loss causation ruling.

Plaintiffs submitted evidence, in the form of testimony from Barry Mukamal, a well-recognized accounting expert, establishing the monetary value of FTCs that Hancock used to reduce its own tax burden. Doc.272-8 (Mukamal Rept.).  The district court denied Hancock's motion to exclude this evidence.  Doc.338.  As Plaintiffs allege that Hancock's fiduciary obligations required it to provide Plaintiffs with a monetary benefit equal to the value of the FTCs it used, Mr. Mukamal's admitted testimony establishes both the profit that Hancock earned from its disloyal conduct and the losses that Plaintiffs suffered.  The two measures are identical.

In either event, regardless of how such monetary relief is characterized, summary judgment is inappropriate, because 29 U.S.C. § 1109(a) allows Plaintiffs to recover "any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." *Id.*; *see Gimeno*, 38 F.4th at 915 ("[E]quitable surcharge is a typical equitable remedy that may be imposed on a fiduciary for a breach of fiduciary duty.").  Thus, even if Mr. Mukamal's testimony only establishes

Hancock's profits, Plaintiffs should be permitted to seek recovery of such profits under the statute.

Finally, the district court erred in considering the named Plaintiffs' current relationship with a different recordkeeper, Fidelity, to analyze loss causation. App.339 at 75. That the named Plaintiffs do not receive FTCs from their current recordkeeper neither excuses any fiduciary breaches of their prior service provider, Hancock, nor eliminates any losses from such prior breaches. Unsurprisingly, the district court cites no authority for its conclusion that such a comparison is relevant to loss causation.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order granting Hancock's motion for summary judgment and remand for further proceedings.

Respectfully submitted,

Peter Prieto
Matthew P. Weinshall
**Podhurst Orseck, P.A.**
Suntrust International Center
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
pprieto@podhurst.com
mweinshall@podhurst.com

John Scarola
Boris L. Zhadanovskiy
**Searcy Denney Scarola**
**Barnhart & Shipley, P.A.**
2139 Palm Beach Lakes Blvd.
West Palm Beach, Florida 33409
(561) 686-6300
jsx@searcylaw.com
bzhadanovskiy@searcylaw.com

*Counsel for Plaintiffs*

56

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,725 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Matthew P. Weinshall*
MATTHEW P. WEINSHALL

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Matthew P. Weinshall*
MATTHEW P. WEINSHALL