No. 22-12366

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

Eric Romano, et al.

*Plaintiffs-Appellants*,

v.

John Hancock Life Insurance Company (U.S.A.),

*Defendant-Appellee*.

-------------------------------------------------------------------------------------

John Hancock Life Insurance Company (U.S.A.),

*Defendant-Cross Appellant,*

v.

Eric Romano, et al.,

*Plaintiff-Cross Appellee*,

Appeal from the United States District Court for the Southern District of Florida.
(Case No. 19-21147-CIV-GOODMAN)

## PRINCIPAL AND RESPONSE BRIEF OF APPELLEE-CROSS APPELLANT JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.)

James O. Fleckner
Jordan Bock
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
jfleckner@goodwinlaw.com
jbock@goodwinlaw.com

Jaime A. Santos
DeMario M. Carswell
Goodwin Procter LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
jsantos@goodwinlaw.com
dcarswell@goodwinlaw.com

February 13, 2023

*Counsel for Appellee-Cross Appellant John Hancock Life Insurance Company (U.S.A.)*

*Romano v. John Hancock Life Ins. Co. (U.S.A.), No. 22-12366*

**AMENDED Eleventh Circuit Rule 26.1 Certificate of Interested Persons**

*Note: Changes to Appellee-Cross Appellant's prior Eleventh Circuit Rule 26.1 Certificate of Interested Persons (filed on August 4, 2022) are highlighted in gray.*

Bock, Jordan

Carswell, DeMario

Del Riego, Alissa

Drake, Ashley

Fahey, Katherine M.

Fleckner, James

Goodman, Hon. Jonathan

Goodwin Procter LLP

Gould, Gabrielle

Gravante III, John

GrayRobinson, P.A.

John Hancock Life Insurance Company (U.S.A.)

Manulife Financial Corporation (NYSE: MCF)

Podhurst Orseck, P.A.

Prieto, Peter

Quintana, Marlene

Reilly, Benjamin S.

Romano, Eric

Romano Law, PL 401(k) Plan

Romano, Todd

Santos, Jaime

Scarola, John

Searcy, Sr., Christian Dietrich

Searcy Denney Scarola Barnhart & Shipley, P.A.

Weinshall, Matthew P.

Zhadanovskiy, Boris L.

*Romano v. John Hancock Life Ins. Co. (U.S.A.), No. 22-12366*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 – 26.1-3, Defendant-Appellee John Hancock Life Insurance Company (U.S.A.) identifies any parent corporation and any publicly held corporation that owns 10% or more of its stock or states that there is no such corporation:

1. John Hancock Life Insurance Company (U.S.A.) is an indirectly wholly owned subsidiary of Manulife Financial Corporation;

2. Manulife Financial Corporation is traded on the Toronto, New York, Philippine, and Hong Kong Stock Exchanges.

Respectfully submitted,

/s/ Jaime A. Santos

| | |
|---|---|
| James O. Fleckner | Jaime A. Santos |
| Jordan Bock | DeMario Carswell |
| Goodwin Procter LLP | 1900 N St., NW |
| 100 Northern Ave. | Washington, D.C. 20036 |
| Boston, MA 02210 | (202) 346-4000 |
| (617) 570-1000 | jsantos@goodwinlaw.com |
| jfleckner@goodwinlaw.com | dcarswell@goodwinlaw.com |
| jbock@goodwinlaw.com | |

*Counsel for Appellee-Cross Appellant*
*John Hancock Life Insurance Company*
*(U.S.A.)*

## STATEMENT REGARDING ORAL ARGUMENT

Appellee-Cross Appellant John Hancock Insurance Company (U.S.A.) submits that oral argument will assist the Court in resolving this appeal. Plaintiffs' claims involve an unprecedented effort to expand the scope of fiduciary liability for service providers of retirement plans, and oral argument would assist the Court in understanding the relevant legal principles and the manner in which they apply in this dispute.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF THE ISSUES............................................................................4

STATEMENT OF THE CASE...............................................................................5

I.     Plaintiffs select mutual funds that invest in foreign securities as options for Plan participants. ................................................................5

    A.     Plaintiffs engage John Hancock as the Plan's service provider...........5

    B.     Plaintiffs choose to invest in mutual funds that purchased foreign securities. ......................................................................8

II.    Plaintiffs sued John Hancock, seeking a rebate for the value of FTCs........10

STANDARD OF REVIEW ...................................................................................12

SUMMARY OF ARGUMENT .............................................................................12

ARGUMENT .........................................................................................................16

I.     Plaintiffs lack standing because they were not injured by John Hancock's application of tax attributes. .......................................................16

II.    John Hancock was not operating as a fiduciary with respect to its treatment of FTCs. ..............................................................................19

    A.     FTCs are not ERISA plan assets. ......................................................21

        1.     ERISA's text, structure, and regulations refute Plaintiffs' plan-assets argument. ...............................................22

        2.     Tax attributes are not plan assets under ordinary notions of property rights.......................................................24

        3.     John Hancock's purported non-disclosure of FTCs does not convert them into plan assets. ...........................................29

        4.     The "source" of FTCs does not make them plan assets...........31

B.   John Hancock did not exercise discretionary authority or control respecting management of the Plan. ....................................34

1.   Plaintiffs' attack on John Hancock's products and services is not the proper subject of a fiduciary-breach claim. ........................................................................34

2.   John Hancock's limited authority to "hold[] plan assets in its separate accounts" and act on "directions from trustee[s], participants and beneficiaries" does not support Plaintiffs' fiduciary-status arguments. ........................39

3.   John Hancock's "control over" its corporate tax deductions or credits is irrelevant to fiduciary status under ERISA. ...........................................................42

III.   John Hancock is entitled to summary judgment on the independent basis that there was no breach of fiduciary duty. .........................................44

A.   John Hancock did not act disloyally. ...................................45

B.   John Hancock did not commit prohibited transactions. ....................48

IV.   The district court properly granted summary judgment based on Plaintiffs' failure to produce evidence of loss causation. ...........................49

V.   If this Court vacates the district court's decision, it should reverse the district court's ruling that Plaintiffs are entitled to a jury trial. ....................51

A.   The Seventh Amendment preserves the right to trial by jury where that right would have existed at common law. ........................52

B.   *Granfinanciera* Step 1: It is undisputed that the analogous action would have been deemed equitable prior to the merger of law and equity. ..................................................54

C.   *Granfinanciera* Step 2: The make-whole monetary relief sought by Plaintiffs for an alleged violation of a breach of trust is an equitable remedy. ...............................................55

D.   The district court's contrary holding, which disregarded *Amara* and erroneously relied on lower-court authority that predated or ignored *Amara*, was erroneous. .......................................60

CONCLUSION ...................................................62

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*,
  925 F.3d 1205 (11th Cir. 2019) .......................................................................... 12

*AcryliCon USA, LLC v. Silikal GmbH*,
  985 F.3d 1350 (11th Cir. 2021) .................................................................... 15, 50

*Allen v. Wells Fargo & Co.*,
  967 F.3d 767 (8th Cir. 2020) ....................................................................... 15, 45

*Bauer-Ramazani v. TIAA-CREF*,
  2013 WL 6189802 (D. Vt. Nov. 27, 2013) .................................................. 52, 59

*Broaddus v. Fla. Power Corp.*,
  145 F.3d 1283 (11th Cir. 1998) .......................................................................... 51

*Brock v. Robbins*,
  830 F.2d 640 (7th Cir. 1987) .............................................................................. 49

*Brotherston v. Putnam Invs., LLC*,
  907 F.3d 17 (1st Cir. 2018) ................................................................................ 45

*Caldwell v. Dretke*,
  429 F.3d 521 (5th Cir. 2005) .............................................................................. 24

*Canestri v. NYSA-ILA Pension Tr. Fund & Plan*,
  2009 WL 3698111 (D.N.J. Nov. 5, 2009) ........................................................... 59

*Carfora v. TIAA*,
  2022 WL 4538213 (S.D.N.Y. Sept. 27, 2022) .................................................... 24

*In re CBI Holding Co.*,
  529 F.3d 432 (2d Cir. 2008) ............................................................................... 12

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco
  Managed Care, L.L.C.*,
  433 F.3d 181 (2d Cir. 2005) ............................................................................... 18

*Chao v. Meixner*,
2007 WL 4225069 (N.D. Ga. Nov. 27, 2007) ....................................................55

*Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*,
494 U.S. 558 (1990)............................................................................................54

*CIGNA Corp. v. Amara*,
563 U.S. 421 (2011)................................................ 52, 54, 55, 56, 58, 59, 60, 61

*Cinerama, Inc. v. Technicolor, Inc.*,
663 A.2d 1134 (Del. Ch. 1994), *aff'd,* 663 A.2d 1156 (Del. 1995) ..................61

*Cotton v. Mass. Mut. Life Ins. Co.*,
402 F.3d 1267 (11th Cir. 2005) .........................................................................20

*In re Daikin Miami Overseas, Inc.*,
868 F.2d 1201 (11th Cir. 1989) .........................................................................29

*Dear v. Q Club Hotel, LLC*,
933 F.3d 1286 (11th Cir. 2019) .........................................................................25

*Depot, Inc. v. Caring for Montanans, Inc.*,
915 F.3d 643 (9th Cir. 2019) .............................................................................42

*Divane v. Nw. Univ.*,
953 F.3d 980 (7th Cir. 2020), *vacated and remanded on other
grounds sub nom. Hughes v. Nw. Univ.*, 142 S. Ct. 737 (2022)........................52

*Donovan v. Bierwirth*,
680 F.2d 263 (7th Cir. 1982) .............................................................................47

*Edmonson v. Lincoln Nat'l Life Ins. Co.*,
725 F.3d 406 (3d Cir. 2013) ........................................................................18, 32

*Ellis v. England*,
432 F.3d 1321 (11th Cir. 2005) .........................................................................12

*F.H. Krear & Co. v. Nineteen Named Trs.*,
810 F.2d 1250 (2d Cir. 1987) ......................................................................20, 39

*Faber v. Metro. Life Ins. Co.*,
2009 WL 3415369 (S.D.N.Y. Oct. 23, 2009),  *aff'd*, 648 F.3d 98
(2d Cir. 2011)......................................................................................................19

*Felber v. Est. of Regan*,
117 F.3d 1084 (8th Cir. 1997) ..............................................47

*In re Fid. ERISA Fee Litig.*,
990 F.3d 50 (1st Cir. 2021)...............................................34

*In re Fid. ERISA Float Litig.*,
829 F.3d 55 (1st Cir. 2016)............................................31, 32

*Fleming v. Fid. Mgmt. Tr. Co.*,
2017 WL 4225624 (D. Mass. Sept. 22, 2017)....................................35

*George v. Kraft Foods Glob., Inc.*,
2008 WL 780629 (N.D. Ill. Mar. 20, 2008) ......................................59

*Gimeno v. NCHMD, Inc.*,
38 F.4th 910 (11th Cir. 2022) ........................................50, 51

*Goetz v. Voya Fin., Inc.*,
2020 WL 550892 (D. Del. Feb. 4, 2020)........................................35

*Golden Star, Inc. v. Mass Mut. Life Ins. Co.*,
22 F. Supp. 3d 72 (D. Mass. 2014) ....................................39

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989)....................................... 52, 53, 54, 55, 57, 62

*Great–West Life & Annuity Insurance Co. v. Knudson*,
534 U.S. 204 (2002)....................................................60, 61

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995)....................................................24

*Guyan Int'l, Inc. v. Professional Benefits Admn'rs, Inc.*,
689 F.3d 793 (6th Cir. 2012) ..............................................47

*Harkless v. Sweeny Indep. Sch. Dist.*,
427 F.2d 319 (5th Cir. 1970) ..............................................56

*Harris Tr. & Savings Bank v. John Hancock Mutual Life Ins. Co.*,
302 F.3d 18 (2d Cir. 2002) ..............................................37

*Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*,
    961 F. Supp. 2d 393 (D. Conn. 2013)....................................................38

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) .......................................................31, 39

*Hellman v. Catalado*,
    2013 WL 4482889 (E.D. Mo. Aug. 20, 2013)....................................55

*Henderson v. Emory Univ.*,
    2018 WL 11350441 (N.D. Ga. Feb. 28, 2018)............................52, 59

*Henry v. Champlain Enterprises, Inc.*,
    445 F.3d 610 (2d Cir. 2006) ..............................................................19

*Hughes v. Northwestern University*,
    142 S. Ct. 737 (2022)........................................................................35

*ITPE Pension Fund v. Hall*,
    334 F.3d 1011 (11th Cir. 2003) .........................................................28

*Johnson v. Ga. Highway Express, Inc.*,
    417 F.2d 1122 (5th Cir. 1969) ...........................................................56

*Kendall v. Emps. Ret. Plan of Avon Prods.*,
    561 F.3d 112 (2d Cir. 2009) ...............................................13, 19, 36

*Kirse v. McCullough*,
    2005 WL 6797091 (W.D. Mo. May 12, 2005)...................................55

*Lanfear v. Home Depot, Inc.*,
    679 F.3d 1267 (11th Cir. 2012) .........................................................43

*Lee v. Blue Cross/Blue Shield of Ala.*,
    10 F.3d 1547 (11th Cir. 1994) ...........................................................29

*Leimkuehler v. Am. United Life Ins. Co.*,
    713 F.3d 905 (7th Cir. 2013) ............................. 20, 34, 35, 36, 40, 41

*Mack v. Metro. Life Ins. Co.*,
    246 F. App'x 594 (11th Cir. 2007)....................................................51

*Malone v. TIAA*,
    2017 WL 913699 (S.D.N.Y. Mar. 7, 2017).......................................................36

*Mass. Mut. Life Ins. Co. v. Russell*,
    473 U.S. 134 (1985)..........................................................................................58

*McCaffree Fin. Corp. v. Principal Life Ins. Co.*,
    811 F.3d 998 (8th Cir. 2016) .......................................................................35, 41

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993)..............................................................................48, 58, 60

*Moitoso v. FMR LLC*,
    410 F. Supp. 3d 320 (D. Mass. 2019).............................................52, 58, 59, 61

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*,
    577 U.S. 136 (2016).....................................................................................60, 61

*Morse v. Stanley*,
    732 F.2d 1139 (2d Cir. 1984) ..........................................................................45

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
    798 F.3d 125 (2d Cir. 2015) ............................................................................60

*Oberly v. Kirby*,
    592 A.2d 445 (Del. 1991) ................................................................................61

*Pegram v. Herdrich*,
    530 U.S. 211 (2000)..........................................................................19, 20, 43

*Perez v. Silva*,
    185 F. Supp. 3d 698 (D. Md. 2016).....................................................52, 59, 61

*Peters v. Aetna Inc.*,
    2 F.4th 199 (4th Cir. 2021) ..............................................................................38

*Plasterers' Loc. Union No. 96 Pension Plan v. Pepper*,
    663 F.3d 210 (4th Cir. 2011) ...........................................................................49

*Pledger v. Reliance Tr. Co.*,
    2017 WL 11568409 (N.D. Ga. Nov. 7, 2017) ....................................................52

*Prado-Steiman ex rel. Prado v. Bush*,
    221 F.3d 1266 (11th Cir. 2000) ........................................................... 11

*Princess Lida of Thurn & Taxis v. Thompson*,
    305 U.S. 456 (1939)............................................................................ 55

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011) ............................................................... 42

*Rolland v. Textron, Inc.*,
    300 F. App'x 635 (11th Cir. 2008) ..................................................... 51

*Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.)*,
    768 F.3d 284 (3d Cir. 2014) ................................. 19, 20, 34, 36, 39, 42

*Santomenno v. Transamerica Life Ins. Co.*,
    883 F.3d 833 (9th Cir. 2018) ....................................................... 34, 39

*Saunders v. White*,
    191 F. Supp. 2d 95 (D.D.C. 2002).................................................... 17

*Shin v. Cobb Cnty. Bd. of Educ.*,
    248 F.3d 1061 (11th Cir. 2001) .......................................................... 11

*Spano v. Boeing Co.*,
    2007 WL 1149192 (S.D. Ill. Apr. 18, 2007) ...................................... 52

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)............................................................................ 18

*Stewart v. KHD Deutz of Am. Corp.*,
    75 F.3d 1522 (11th Cir. 1996) .......................................................... 51

*Thole v. U. S. Bank N.A*,
    140 S. Ct. 1615 (2020)................................................................. 16, 18

*Tracey v. Mass. Inst. of Tech.*,
    2019 WL 1005488 (Feb. 28, 2019), *report & recommendation*
    *adopted*, 395 F. Supp. 3d 150 (D. Mass. 2019).....................52, 59, 61

    395 F. Supp. 3d 150 (D. Mass. 2019)...................................52, 59, 61

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)..................................................................17

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir. 2014) ......................................................32

*United States v. Richardson*,
    518 F. App'x 708 (11th Cir. 2013) ............................................48

*Useden v. Acker*,
    947 F.2d 1563 (11th Cir. 1991) ..........................................49, 51

*Vander Luitgaren v. Sun Life Assurance Co. of Can.*,
    765 F.3d 59 (1st Cir. 2014).......................................15, 37, 45, 46, 47

*Varity Corp. v . Howe*,
    516 U.S. 489 (1996)....................................................................48

*Veolia Water N. Am. Operating Servs., LLC v. City of Atlanta*,
    546 F. App'x 820 (11th Cir. 2013) ............................................50

*Willett v. Blue Cross & Blue Shield of Ala.*,
    953 F.2d 1335 (11th Cir. 1992) ..........................................15, 49

*Williams v. Centerra Grp., LLC*,
    579 F. Supp. 3d 778 (D.S.C. 2022) ....................................52, 59, 61

**Statutes**

26 U.S.C. § 853(b)(2)(A) ....................................................................8

26 U.S.C. §§ 901-909 ........................................................................36

29 U.S.C. § 1002(21)(A)..............................................................19, 42

29 U.S.C. § 1002(21)(A)(i)..................................................21, 22, 34, 43

29 U.S.C. § 1002(38)(A)....................................................................23

29 U.S.C. § 1002(42)..........................................................................22

29 U.S.C. § 1021(a)-(b) ......................................................................21

29 U.S.C. § 1102(a) ............................................................................19

29 U.S.C. § 1103(a) ...................................................................23

29 U.S.C. § 1104(a)(1)(A) ........................................................45

29 U.S.C. § 1106(b)(1)...........................................................15, 48

29 U.S.C. § 1108(b)(2)(B)(ii)(I)(aa) ........................................30

29 U.S.C. § 1108(b)(2)(B)(ii)(I)(dd)(AA) ...............................30

29 U.S.C. § 1108(b)(2)(B)(iii)(III) ...........................................30

29 U.S.C. § 1109(a) ............................................15, 49, 54, 58, 59

29 U.S.C. § 1132(a)(2)..................................................51, 53, 58, 62

29 U.S.C. § 1132(a)(3)...............................................................53

29 U.S.C. § 1132(g)(2)(E) .........................................................58

29 U.S.C. § 1344(d)(3)(A)..........................................................23

## Regulations

29 C.F.R. § 2510.3-101..............................................................22

29 C.F.R. § 2510.3-102..............................................................22

29 C.F.R. § 2550.401c-1 ............................................................40

29 C.F.R. § 2550.404a-5(a) .......................................................21

29 C.F.R. § 2550.408b-2(c)(1)(iv)(C) .......................................30

75 Fed. Reg. 41,600 (July 16, 2010)..........................................30

## Other Authorities

*Bogert's Law of Trusts & Trustees* § 870 ................................57

Dan B. Dobbs, *Law of Remedies* § 4.1(1) (2d ed. 1993) .........50

DOL, *Advisory Council Report of the Working Group on Fiduciary
     Responsibilities and Revenue Sharing Practices*, https://bit.ly/30LPeGU..........7

DOL, Advisory Op. No. 93-14A, 1993 WL 188473 (May 5, 1993).................24, 33

DOL, Advisory Op. No. 1997-15A (May 22, 1997),
    https://bit.ly/3oKClVF ........................................................................7

IRS Private Letter Ruling 9528004, 1995 WL 414084 (Mar. 29, 1995).................44

Restatement (Second) of Trusts (1959) .......................................................54, 56, 57

Restatement (Third) of Trusts (2012) ....................................................................56

2 Joseph Story, *Commentaries on Equity Jurisprudence* (13th ed. 1886) .............54

## INTRODUCTION

This case is about two owners of a law firm, the Romanos, trying to extract a benefit to which they are not entitled.  The Romanos contracted with John Hancock to provide recordkeeping services and a platform of investment options for their firm's 401(k) plan.  The Romanos chose several investment options for the plan that, by operation of the U.S. Tax Code, required John Hancock to increase its taxable income and then permitted John Hancock to apply a corresponding tax deduction or credit on its U.S. income-tax returns.  The Romanos then sued John Hancock under ERISA for over $100 million, claiming that the tax credits should have been theirs.  None of this is actionable under federal law.

Under the John Hancock investment platform that the Romanos chose, plan assets were allocated to "separate accounts" of John Hancock and the separate accounts were divided into sub-accounts, each of which owned shares of a pre-specified mutual fund.  The Romanos chose investment options for their plan line-up by selecting a subset of those sub-accounts.  When plan participants decided to invest their retirement-account balance in one of those sub-accounts, John Hancock purchased shares of the corresponding mutual fund (in its own name) and applied any investment gains or losses to the sub-account.  Some of these mutual funds invested in foreign securities subject to foreign taxes.  Under the U.S. Tax Code, those mutual funds could (and often did) make an election requiring shareholders

(here, John Hancock) to include those foreign taxes as part of their taxable income on their U.S. federal tax returns. That election triggered a non-transferable foreign tax credit ("FTC") or deduction that could be applied *only* by the taxpaying shareholder (again, John Hancock), who was required to report the foreign taxes as taxable income.

The Romanos have never disputed that John Hancock was the legal shareholder of the mutual funds and was the only entity entitled to apply these FTCs on its tax returns. They have also never disputed that their 401(k) plan—as a tax-exempt entity—could not have applied FTCs even if it *had been* the legal shareholder of the mutual funds. Nor have the Romanos disputed that they selected this arrangement and the funds at issue with no advice from John Hancock. Indeed, they retained an independent advisor to assist in fund and service-provider selection. The Romanos nonetheless sued John Hancock for applying a non-transferable tax credit that it was legally entitled to apply, claiming that John Hancock had a duty to monetize that credit and hand the benefit over to their plan. Plaintiffs' theory is that, by failing to do so, John Hancock acted as an ERISA fiduciary (and breached its fiduciary duties), either because FTCs constitute "plan assets" under ERISA or because FTCs supposedly arose from John Hancock exercising discretion over "plan management." Both theories are deeply flawed.

The first theory is wrong because "plan assets" are investments and monetary

contributions that are bought, sold, and distributed to participants to pay their retirement benefits, and courts have consistently rejected efforts to expand "plan assets" beyond this common-sense meaning. The non-transferable corporate tax credits of a plan's service provider do not fall within this meaning, despite the Romanos' tortured interpretation of ERISA and of the parties' agreement in arguing otherwise. The second theory is wrong because John Hancock exercised no relevant discretion over the management of the plan and its selection of investments subject to foreign taxes. When, whether, or by how much (if at all) foreign taxes paid in any given year can be used as tax credits to reduce John Hancock's tax liability depends on a variety of factors completely unrelated to the plan, including the total taxable income of John Hancock's worldwide operations. John Hancock's corporate tax filings are simply not governed by ERISA.

At its core, the Romanos' lawsuit is an attack on the design of John Hancock's products and services—and as the district court correctly recognized, circuits across the country have consistently rejected efforts to impose *fiduciary* obligations on service providers' *product-design* decisions. Trustees of ERISA-governed plans are always free to reject a product or attempt to negotiate different terms. But *they* have fiduciary obligations over those arrangements—not the providers they hire.

For these reasons, and others discussed below—including the lack of injury to the Romanos caused by John Hancock's applying a credit on its own tax returns—

3

this Court should affirm the judgment.  But if it vacates that judgment, it should address one remaining issue that will be relevant on remand:  whether Plaintiffs are entitled to a jury trial.  As courts have repeatedly held, ERISA fiduciary-breach claims are equitable actions seeking equitable relief; the Seventh Amendment does not require them to be tried to a jury.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly held that Plaintiffs lacked standing to challenge John Hancock's receipt of a tax benefit in the absence of any corresponding injury to Plaintiffs.

2. Whether the district court correctly held that John Hancock was not operating as an ERISA fiduciary with respect to FTCs, on the basis that (i) FTCs are not plan assets, and (ii) John Hancock's application of FTCs did not involve discretionary acts of plan management.

3. Whether the district court correctly held that John Hancock did not breach its fiduciary duties or engage in prohibited transactions where Plaintiffs presented no evidence of disloyal intent, John Hancock did not engage in a "transaction" involving plan assets, and John Hancock did not take active steps to be entitled to apply FTCs.

4. Whether the district court correctly held that Plaintiffs failed to show a loss to the Plan.

5.    Whether the district court erred in denying John Hancock's request to strike the jury demand, given Supreme Court precedent establishing that fiduciary-breach claims for monetary relief are equitable claims seeking equitable relief.

## STATEMENT OF THE CASE

### I.    Plaintiffs select mutual funds that invest in foreign securities as options for Plan participants.

#### A.    Plaintiffs engage John Hancock as the Plan's service provider.

In 2014, Plaintiffs established a 401(k) plan (the "Plan") for themselves and employees of their jointly owned law firm, Romano Law PL.  App.339 at 8; SApp165(17:10-13).  The Romanos named themselves Plan trustees, and engaged Financial Advisor Christian Searcy, Jr. to recommend service providers and investments for the Plan.  App.339 at 9; SApp164(10:3-14), SApp167(68:10-19), SApp186(86:4-24).  On Searcy's recommendation, the Romanos contracted with John Hancock, an insurance company that offers products and services to 401(k) plans.  App.339 at 9-10; SApp159-160.  The Romanos signed a group variable annuity contract (the "Contract," SApp123), which made available a platform of investment options for the Plan and its participants, as well as a recordkeeping agreement ("RKA," SApp100), under which John Hancock agreed to provide administrative and recordkeeping services for the Plan.  App.339 at 10-11.

The Contract allowed the Plan to make contributions into John Hancock separate accounts, which are accounts "segregated from the general funds of the

5

Company [John Hancock]," meaning "[a]ny income, gains, or losses … from assets in a Separate Account will be credited or charged against said account without regard to the other income, gains, or losses of the Company."  App.339 at 12; SApp125. The separate accounts were divided into sub-accounts corresponding to pre-specified mutual funds that Plaintiffs (acting on behalf of the Plan) could select for the Plan.  App.339 at 12; SApp125; SApp154-155(44:24-45:15).  The Plan's assets were allocated among those sub-accounts, John Hancock invested those amounts as directed, and applied any investment gains or losses to the sub-account.  App.339 at 12.  John Hancock, however, was the legal and tax owner of the assets in the separate accounts.  *Id.*; SApp125.

Withdrawals from the sub-accounts were made at market value, which, in the case of mutual fund shares held in the sub-accounts, was the "net asset value" ("NAV") per share as provided by the mutual fund.  App.339 at 12-13; SApp125, 128.  The NAV was determined based on the underlying mutual fund's holdings and investment performance, net of all fees and expenses (*e.g.*, foreign taxes paid). App.339 at 17; SApp489-490.

John Hancock's fees for administrative and recordkeeping services included an "Annual Maintenance Charge" ("AMC") of 0.60% of the assets in each sub-account.  App.339 at 15; SApp137, 140; SApp230.  As explained in the Contract and RKA, along with the Fund Information Guide and incorporated supplemental

documents, the 0.60% AMC could be "reduce[d]" by "revenue sharing" "fees" or "credits" that John Hancock sometimes receives from mutual funds because, as a recordkeeper for retirement-plan investors, it performs many of the administrative functions that a mutual fund would otherwise provide.  App.339 at 15; SApp140; SApp254.  This commonplace practice is widely referred to as "revenue sharing."[1] And as set forth in the Contract, John Hancock agreed to use those revenue-sharing fees and credits as an offset to "reduce the AMC" charged to plans.  SApp140; SApp254.

Both the Supplemental Information Guide and the RKA disclosed the total cost of investing in each sub-account after any reductions were applied.  App.339 at 16; SApp109-114; SApp239-245.  The Romanos also received a Fund Information Guide with additional information about the sub-accounts and their investments and fees.  App.339 at 16; SApp261-SApp467.  It further explained that additional information about each fund was "available upon request," including "complete details on investment objectives, risks, fees, charges and expenses as well as other information about the underlying investment vehicle, which should be carefully considered."  SApp468.

---

[1]  *See* DOL, Advisory Op. No. 1997-15A, at 1-2 (May 22, 1997), https://bit.ly/3oKClVF; DOL, *Advisory Council Report of the Working Group on Fiduciary Responsibilities and Revenue Sharing Practices*, https://bit.ly/30LPeGU.

On advice from Searcy—with no input from John Hancock—the Romanos chose options for the Plan from over 200 sub-accounts. App.339 at 12-14. John Hancock processed transactions in the sub-accounts only on the direction of Plaintiffs and participants. App.339 at 13. The Contract thus explained that, by providing recordkeeping services and making available its platform of investments, John Hancock did "not assume any fiduciary responsibility of the Contractholder, Plan Administrator, Plan Sponsor or any other Fiduciary of the Plan." App.339 at 13-14. The RKA likewise provided that John Hancock would not have any discretionary authority or responsibility for the management or control of the separate accounts' assets; instead, its authority was limited to holding assets in the separate accounts and allocating them following instructions of the Romanos and participants. App.339 at 14; SApp101.

**B.    Plaintiffs choose to invest in mutual funds that purchased foreign securities.**

Some of the sub-accounts owned shares in mutual funds that invested in foreign securities and were subject to foreign taxes. Plaintiffs selected several on Searcy's recommendation. App.339 at 17; SApp484-486. Under U.S. tax laws, a mutual fund paying foreign taxes may make an election requiring shareholders that are U.S. taxpayers to include the amount paid in foreign taxes as income on their federal income tax returns—known as a foreign tax "gross up." 26 U.S.C. § 853(b)(2)(A); *see also* App.339 at 17-19; SApp533(61:9-16). When that occurs,

8

the shareholder also may qualify for a choice between a corresponding FTC or deduction.  App.339 at 17-19; SApp516; SApp537(88:15-17).  Here, John Hancock owns the mutual fund shares held in the separate accounts, and thus is required to gross-up its taxable income to include the foreign taxes paid by a mutual fund that makes this election.  It may then also qualify for associated tax credits or deductions.

These tax obligations apply to John Hancock, not to John Hancock's ERISA-governed plan customers.  Because the Plan is not the owner of the shares of mutual funds that invest in foreign securities for tax purposes—John Hancock is—the Plan does not have to gross-up its income to include those foreign taxes.  And even if the Plan were the owner of the shares, it does not pay federal income taxes because of its tax-exempt status and thus would not be eligible for a corresponding FTC or deduction.  Accordingly, there "[is] no way for the [Plan] to offset … foreign tax payments by using the foreign tax credit or deduction."  SApp540-541; *see also* App.339 at 18-19.

After making their initial selection of investment options in 2014, Plaintiffs periodically reviewed the Plan's investments and performance with Searcy.  App.339 at 19; SApp168-169(81:1-82:1).  On February 13, 2019—one month before filing suit—Plaintiffs and Searcy determined that "everything was in pretty good order" with the Plan and its investments.  App.339 at 19; SApp549.

On November 19, 2020—almost two years after filing this action—Plaintiffs,

with Searcy's participation, selected Fidelity to replace John Hancock as recordkeeper, citing cost, brand recognition, "high level technology," and "a single login integration." App.339 at 19-20; SApp554-555. On Searcy's recommendation, Plaintiffs again selected as investment options mutual funds that invest in foreign securities. SApp195(164:10-16); SApp225-226(238:21-239:7); SApp557-558. Those mutual fund shares are now owned directly by the Plan's trust because Fidelity does not use separate accounts for plan investment options, which means that the Plan's trust is the legal and tax owner of the mutual funds. App.339 at 20; SApp194(159:3-9), SApp199(181:15-19). Under this new arrangement the Plan still does not receive any financial benefit from FTCs because, as a tax-exempt entity, the Plan's trust has no taxable income to gross-up and therefore cannot use FTCs or deductions. App.339 at 20-21; SApp198-199(180:22-181:6), SApp202(203:12-16). Thus, the Plan trustees negotiated a new recordkeeping arrangement that places the Plan in precisely the same position now as it was when John Hancock was recordkeeper.

## II.    Plaintiffs sued John Hancock, seeking a rebate for the value of FTCs.

Plaintiffs, in their capacity as Plan trustees, filed a class action alleging that John Hancock both owed and violated ERISA's fiduciary duty of loyalty and violated ERISA's prohibited-transaction provisions by "receiving and retaining Plan [FTCs]" without disclosing that to plan trustees or crediting the financial benefit of

FTCs to plans invested in those funds.  App.1 at 13-15.  The district court certified a nationwide class of trustees of defined-contribution plans that entered into group annuity contracts with John Hancock and selected mutual funds that paid foreign taxes.  App.307 at 33.[2]

Two of the district court's orders are at issue here.  First, Plaintiffs appealed the grant of summary judgment in John Hancock's favor.  App.352.  The district court concluded, "by way of overall summary," that neither ERISA nor the parties' contracts required John Hancock "to provide its customers with rebates for the [FTCs] *it* used."  App.339 at 2.  "[A]lthough Plaintiffs could have tried to negotiate with John Hancock for rebates or credits (for the FTCs) or other, better pricing, they did not, choosing instead to invest in the funds which they selected."  *Id.*  Thus, the Court concluded, "John Hancock did not violate a fiduciary duty of loyalty or engage

---

[2] The district court subsequently identified aspects of its class-certification order that it would have decided differently and indicated that it might rescind or modify its class-certification order based on subsequent case developments.  App.339 at 79-82. While John Hancock does not contend on appeal that the district court abused its discretion in certifying a class based on the record before it at the time of its class-certification ruling, John Hancock reserves its right to ask the district court to exercise its discretion to decertify if this Court vacates the judgment.  *See Shin v. Cobb Cnty. Bd. of Educ.*, 248 F.3d 1061, 1065 (11th Cir. 2001) ("The district judge may review his certification order at any time …."); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1273 (11th Cir. 2000) (district court's power to alter or amend class-certification orders "is critical, because the scope and contour of a class may change radically as discovery progresses and more information is gathered about the nature of the putative class members' claims").

in a prohibited transaction by complying with the parties' contracts and by engaging in FTC transactions authorized by the federal tax code." *Id.*

Second, the district court denied John Hancock's motion to strike Plaintiffs' jury demand, holding that Plaintiffs were entitled to a jury trial for what the district court deemed to be "non-equitable remedies under Section 502(a)(2) of ERISA."[3] SApp13.[4]

**STANDARD OF REVIEW**

This Court reviews de novo the district court's standing determination, *A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019), and grant of summary judgment, *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005).

**SUMMARY OF ARGUMENT**

This Court can affirm the district court's grant of summary judgment on any one of four independent bases:  (1) Plaintiffs lack standing to challenge John

---

[3] Consistent with typical federal appellate practice, John Hancock cites ERISA provisions using the U.S. Code.  *E.g.*, Supreme Court Rule 34.5; *see also* https://benefitslink.com/erisa/crossreference.html  (ERISA-U.S. Code cross-references).

[4] As explained in John Hancock's response to this Court's "Jurisdictional Question," this ruling is properly before the Court on conditional cross-appeal because, if this Court vacates the judgment but adopts John Hancock's position regarding Plaintiffs' jury demand, it will expand John Hancock's rights on remand and diminish Plaintiffs' rather than offer an alternative ground for affirmance.  *See, e.g., In re CBI Holding Co.*, 529 F.3d 432, 465-466 (2d Cir. 2008) (exercising jurisdiction over conditional jury-trial issue).

12

Hancock's application of a tax attribute that did not injure Plaintiffs; (2) John Hancock was not a fiduciary with respect to its treatment of FTCs; (3) John Hancock did not breach the duty of loyalty or commit prohibited transactions; and (4) Plaintiffs failed to establish a loss to the Plan resulting from any breach.

I. *Standing:* The district court correctly determined that Plaintiffs did not possess Article III standing. Plaintiffs' claims challenge John Hancock's entitlement to FTCs, but they have failed to show that they themselves suffered an injury, as Article III requires. *See Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 120 (2d Cir. 2009), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). A benefit to a defendant does not automatically convert into an injury to the plaintiff merely because the plaintiff would like the benefit for itself.

II. *Fiduciary Status:* Plaintiffs' theory of fiduciary status rests on two theories: (1) John Hancock exercised control over FTCs and therefore over plan assets; and (2) John Hancock exercised discretionary authority with respect to plan management. Both arguments fail.

The first theory fails because FTCs are not plan assets. ERISA's text and structure, along with DOL regulations, define plan assets by reference to investments and monetary assets that can be bought, sold, traded, held in trust, and distributed to plan participants to pay their retirement benefits. Non-transferable tax attributes that

can be applied only by the relevant taxpayer fall well outside this concept. Plaintiffs attempt to rely on the Contract and RKA, arguing that John Hancock agreed to provide rebates to plans for FTCs. But Plaintiffs' argument is premised on a gross mischaracterization of these documents, which simply agreed to provide rebates of "*revenue-sharing*" fees or credits that John Hancock receives *from mutual funds*. This language does not include tax deductions or credits that might be available to John Hancock under federal tax laws.

The second theory fails because John Hancock did not exercise any discretionary acts of plan management. Federal appellate courts across the country consistently hold that service providers do not assume fiduciary status with respect to their products or compensation where plan fiduciaries have the discretion to reject those products. Nor can Plaintiffs establish John Hancock's relevant fiduciary status by pointing to its limited authority to "hold" plan assets in separate accounts and act pursuant to participants' instructions—duties that, if fiduciary in nature at all, are extraordinarily limited and are not the duties Plaintiffs allege were violated. Under ERISA's functional-fiduciary definition, this limited authority cannot give rise to a fiduciary-breach claim based on *corporate* actions that fall outside ERISA's regulatory scope.

III. *Breach:* The district court properly determined that, even assuming John Hancock is a relevant fiduciary, it did not breach its fiduciary duties by receiving an

incidental financial benefit that did "not unfairly diminish, impair, restrict, or burden the beneficiary's rights …" *Vander Luitgaren v. Sun Life Assurance Co. of Can.*, 765 F.3d 59, 65 (1st Cir. 2014).  Nor was there any evidence in the record that John Hancock had a subjectively disloyal intent in dealing with the Plan.  *See Allen v. Wells Fargo & Co.*, 967 F.3d 767, 776 (8th Cir. 2020).

The district court also properly determined that John Hancock did not commit a 29 U.S.C. § 1106(b)(1) prohibited transaction.  That claim is wholly reliant on Plaintiffs' untenable argument that corporate tax credits are assets of retirement plans.  In any event, Plaintiffs' failure to challenge the district court's alternative ground for rejecting this claim—the lack of active steps by John Hancock to entitle itself to FTCs—provides an independent ground for affirmance.

IV.  *Loss Causation*:  The district court likewise properly granted John Hancock's motion for summary judgment on the independent ground that Plaintiffs have failed to show "any losses to the plan resulting from" any breach.  29 U.S.C. § 1109(a); *see also Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992).  The only testimony Plaintiffs presented on loss showed the monetary benefit to John Hancock—not any losses incurred by the Plan.  This is not loss.  *See AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1368 (11th Cir. 2021).  To the extent Plaintiffs now maintain that they are entitled to disgorgement of John Hancock's profits, the district court expressly held that Plaintiffs forfeited

this claim below (App.339 at 77), and Plaintiffs do not support this theory on appeal either.

V. *Jury Trial:* In the event the Court does not affirm the district court's summary-judgment ruling, it should reverse the district court's conclusion that Plaintiffs are entitled to a jury trial. Plaintiffs brought equitable claims for equitable remedies; they have no Seventh Amendment right to a jury trial.

**ARGUMENT**

## I.  Plaintiffs lack standing because they were not injured by John Hancock's application of tax attributes.

Plaintiffs lack standing to pursue their claims because they have failed to establish that they suffered any cognizable injury. "There is no ERISA exception to Article III." *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1622 (2020). Thus, even though the statute allows plaintiffs to pursue claims for loss, disgorgement, and other equitable relief, they still must demonstrate a "concrete, particularized" injury. *Id.* at 1618. The district court correctly held that Plaintiffs did not satisfy this constitutional requirement. They offered no evidence (or even theory) of how *they were harmed* by John Hancock's applying a non-transferable tax credit on its corporate tax returns. Instead, Plaintiffs' theory of injury is entirely predicated on John Hancock experiencing a corporate benefit—a lower tax burden. But any reduction in John Hancock's tax obligation is not an injury to Plaintiffs at all, much less an "actual" and "concrete" one.

16

Plaintiffs do not dispute that John Hancock was within its rights to apply FTCs against its overall tax liability.  Nor do Plaintiffs dispute that the Plan does not pay any U.S. taxes (but John Hancock does); that the Plan was not required to gross-up its taxable income due to mutual funds' elections (but John Hancock was); or that the Plan could not apply FTCs even if it had been the owner of the mutual fund shares at issue.

In a nutshell, Plaintiffs complain that John Hancock did not turn over an income-tax credit that it properly reported on its own tax return and that their Plan could not.  Plaintiffs notably do not contend that John Hancock *must apply* FTCs to reduce its tax burden—just that *if John Hancock does so*, it should hand the benefit of a lower tax burden over to its customers.  But just as a desire for statutory penalties does not create standing in the absence of injury caused by a defendant's conduct, *see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2206 (2021), Plaintiffs' desire to benefit from John Hancock's tax savings does not establish standing either.

Moreover, nothing in the Plan changes based on John Hancock's tax status. *See Saunders v. White*, 191 F. Supp. 2d 95, 109 n.18 (D.D.C. 2002) (plaintiff failed to establish standing where he would be "in precisely the same position either way," regardless of the defendant's challenged conduct).  The Plan's current arrangement with its new recordkeeper demonstrates this point.  Because Fidelity does not use a separate-account structure, Fidelity is not the owner of the mutual fund shares in

which the Plan invests.  App.339 at 20-21.  Thus, it is not required to gross-up its taxable income by the amount those funds paid in foreign taxes and therefore cannot apply a corresponding FTC or deduction.  Instead, the Plan's trust owns those mutual fund shares, the Plan's investments still pay foreign taxes (because Plaintiffs still have chosen mutual funds that invest in foreign securities), and the Plan *still* does not obtain any financial benefit from foreign tax credits or deductions because the Plan and the trust are tax-exempt.  App.339 at 21, 44; *see supra*, pp. 9-10.

Plaintiffs cite *Spokeo, Inc. v. Robins,* 578 U.S. 330, 341 (2016), to suggest that simply asserting fiduciary-breach claims "is more than sufficient to establish standing."  Opening Br. 19-20.  Nonsense.  *Spokeo* holds that "Article III standing requires a concrete injury even in the context of a statutory violation."  578 U.S. at 341.  And the Supreme Court subsequently emphasized that ERISA does not provide an "exception to Article III."  *Thole*, 140 S. Ct. at 1622.

Plaintiffs' reliance on *Edmonson v. Lincoln National Life Insurance Co.*, 725 F.3d 406 (3d Cir. 2013), is likewise misplaced.  To the extent *Edmonson* actually abrogated the injury-in-fact requirement for disgorgement, *id.* at 415, this holding cannot survive the Supreme Court's more recent jurisprudence.  As the Second Circuit noted in reaching a contrary conclusion, "[s]tatutes do not abdicate the standing requirements of the Constitution."  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 200 (2d Cir.

2005); *see also Kendall*, 561 F.3d at 119; *Faber v. Metro. Life Ins. Co.*, 2009 WL 3415369, at *4 (S.D.N.Y. Oct. 23, 2009), *aff'd*, 648 F.3d 98 (2d Cir. 2011).  In any event, affirmance on this ground is consistent with ERISA—the statute's "aim" is "to make the plaintiffs whole, but not to give them a windfall." *Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610, 624 (2d Cir. 2006) (citation omitted).  Because Plaintiffs are uninjured, they *are* whole; Article III (like ERISA) simply prevents them from obtaining the "windfall" they seek in federal court.

## II. John Hancock was not operating as a fiduciary with respect to its treatment of FTCs.

Fiduciary status is a "threshold question":  a defendant that is not an ERISA fiduciary cannot be liable for breaching ERISA's fiduciary duties.  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).  One can be deemed an ERISA fiduciary in two ways:  being a named fiduciary in the plan document, 29 U.S.C. § 1102(a), or being a functional fiduciary, § 1002(21)(A).  The latter category is entirely "contextual": it applies only "to the extent (i) [the fiduciary] exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation … or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A); *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.)* ("*Santomenno I*"), 768 F.3d 284, 293 (3d Cir. 2014).

19

Service providers who design and market products to plan fiduciaries are generally not considered fiduciaries in that role. *See Santomenno I*, 768 F.3d at 293; *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 911-912 (7th Cir. 2013). That is because a service provider "has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement with him," *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987). Instead, each plan has its own fiduciaries whose duty is to retain service providers and negotiate appropriate terms on which those services will be provided.

Thus, unless the service provider exercises certain types of discretionary responsibility over plan assets or plan management, it has no fiduciary responsibilities and cannot be liable for breaching them. And if the service provider exercises these types of discretionary responsibilities, it can be held liable *only* to the extent it was acting in its fiduciary capacity (as opposed to its mere-service-provider capacity) "when taking the action subject to complaint." *Pegram*, 530 U.S. at 226. That is because "fiduciary status under ERISA is not an 'all-or-nothing concept'"—an individual can be a fiduciary with respect to some activities (*e.g.*, discretionary investment selection) but not with respect to others (*e.g.*, providing recordkeeping services)—and so "court[s] must ask whether a person is a fiduciary with respect to the particular activity at issue." *Cotton v. Mass. Mut. Life Ins. Co.*,

402 F.3d 1267, 1277 (11th Cir. 2005).

Plaintiffs maintain that John Hancock was a fiduciary under the first functional-fiduciary definition[5]—they argue that John Hancock (a) exercised control with respect to FTCs, which they contend are plan assets, and (b) exercised discretionary authority over plan management by holding plan assets in its separate accounts. Both arguments are incorrect. FTCs are non-transferable tax attributes, not plan assets, and nothing in the Contract or RKA transformed FTCs into plan assets. And John Hancock's limited responsibility to hold assets in separate accounts and act pursuant to participant instructions did not broadly transform John Hancock into a fiduciary with respect to the product it offers to the retirement-plan marketplace. Nor did that limited authority give rise to expansive fiduciary responsibility over everything tangentially related to those separate accounts.

### A. FTCs are not ERISA plan assets.

There is no support in the statutory text, precedent, or logic for the proposition that non-transferable tax deductions or credits that can only be applied by a taxpayer

---

[5] Plaintiffs occasionally use "management and administration of the plan[]" to describe John Hancock's purported authority. *E.g.*, Opening Br. 16, 24, 35-36. But Plaintiffs do not argue that John Hancock was a plan administrator responsible for carrying out the Plan's administrative functions—*i.e.*, sending out participant-fee disclosures, 29 C.F.R. § 2550.404a-5(a), submitting the Plan's annual report to DOL, furnishing documents to participants, 29 U.S.C. § 1021(a)-(b), etc. Thus, in substance, Plaintiffs argue John Hancock's fiduciary status only under § 1002(21)(A)(i).

on its federal tax filings could constitute "plan assets." Thus, Plaintiffs' argument that John Hancock is a fiduciary under the second clause of § 1002(21)(A)(i) is meritless.

### 1.    ERISA's text, structure, and regulations refute Plaintiffs' plan-assets argument.

ERISA states that "the term 'plan assets' means plan assets as defined by such regulations as the Secretary [of Labor] may prescribe." 29 U.S.C. § 1002(42). The Secretary has prescribed two such regulations. Both define plan assets by reference to investments and monetary contributions—property that can be bought, sold, and distributed to pay retirement benefits. *See* 29 C.F.R. § 2510.3-101 (plan assets sometimes include the underlying assets of entities in which a plan has invested); *id.* § 2510.3-102 (plan assets include "amounts" contributed to the plan by plan participants and beneficiaries).

A taxpayer's credits or deductions do not fall within this understanding. Much like the foreign-tax gross-up John Hancock was required to include on its tax returns, or like a child tax credit one might include on her Form 1040, foreign tax credits and deductions are "inalienable, nontransferable tax attribute[s] specific to John Hancock," not property that can be transferred to or used by others. App.339 at 61.[6]

---

[6] Plaintiffs repeatedly refer to John Hancock having "received and retained" FTCs (Opening Br. 1, 7, 11), as if FTCs are tangible objects that come into a taxpayer's possession and can be kept for the taxpayer's own benefit or conveyed to others as the taxpayer wishes. But foreign tax gross-ups, credits, or deductions do not work

ERISA's broader text and structure confirm this common-sense understanding. Congress repeatedly made clear that "plan assets" refer to transferable money, investment holdings, or similar assets that are capable of being held in trust or distributed to participants. These provisions would not make sense if the term "plan asset" encompassed a service provider's tax attributes. For example, ERISA states that "all assets of an employee benefit plan shall be held in trust by one or more trustees" and gives those plan trustees "exclusive authority and discretion to manage and control the assets of the plan" or delegate that authority "to one or more investment managers." 29 U.S.C. § 1103(a). The statute also expressly links "assets" with "investments" by defining the term "investment manager" as someone "who has the power to manage, acquire, or dispose of any asset of a plan." 29 U.S.C. § 1002(38)(A). This framework makes sense as applied to money and investments, but not as to non-transferable tax credits or deductions that can be applied only by the specific taxpayer designated by the Code.

Similarly, Section 1344 provides for "[a]llocation of [the] assets" of a plan in the event of its termination, and states that the assets shall be used to pay participants' benefits, with any remaining assets "equitably distributed to the participants who made such contributions or their beneficiaries." 29 U.S.C.

---

this way—they can (or must) be applied only by the relevant taxpayer when determining its income tax obligation.

§ 1344(d)(3)(A). On Plaintiffs' theory, a terminating plan would have to sell FTCs for which its service provider (if it were the designated taxpayer) might be eligible to raise money to pay benefits, or distribute those FTCs in kind—something that is impossible because FTCs are "inalienable" and "nontransferable." App.339 at 61.

Because courts "construe statutes, not isolated provisions," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995), where possible, courts should "give a term consistent meaning throughout an act," *Caldwell v. Dretke*, 429 F.3d 521, 527 (5th Cir. 2005) (citing *Gustafson*). Courts have done so by interpreting "plan assets" consistent with ERISA's text and structure, and rejecting broad interpretations that have no support in the statute's text. *See, e.g.*, *Carfora v. TIAA*, 2022 WL 4538213, at *17 (S.D.N.Y. Sept. 27, 2022) (collecting cases rejecting a theory that participants' personal information qualifies as a "plan asset" merely because the data may be valuable to the recordkeeper). The same outcome is warranted here.

### 2. Tax attributes are not plan assets under ordinary notions of property rights.

As the district court noted, one approach for identifying plan assets looks to "ordinary notions of property rights under non-ERISA law." App.339 at 59 (quoting DOL, Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993)). Plaintiffs offer only one argument that FTCs qualify as plan assets under this approach: they contend that the Contract and RKA granted John Hancock's customers a "beneficial interest" in the company's corporate tax credits. Opening Br. 26-28. This argument

24

is based on a gross mischaracterization of these documents, as Plaintiffs elsewhere implicitly concede.  Opening Br. 39 ("Neither the Contract nor the RKA specifies how Hancock will allocate the FTCs ….").

Plaintiffs point to a provision describing instances in which John Hancock's 0.60% AMC can be reduced or offset by money that John Hancock receives. SApp140.  That provision says that "all revenue received from the underlying mutual fund, trust or portfolio [will] reduce the AMC for the Sub-account." *Id.*  According to Plaintiffs, the Contract defines "revenue from the underlying fund" to mean *all* "credits that [Hancock]" receives.  Opening Br. 28 (quotation marks omitted; brackets in original).  Plaintiffs argue that this gives plans a "beneficial interest" in FTCs under ordinary notions of property rights.  *Id.*

But this argument completely distorts what the Contract says.  Plaintiffs notably never explain *why* FTCs should be understood as "credits" within the purview of this provision; their argument appears to turn solely on the fact that the "C" in "FTC" stands for "credit," and the word "credit" also appears in the Contract. *See* Opening Br. 28-29.[7]  But courts do not interpret contractual terms in isolation, *see Dear v. Q Club Hotel, LLC*, 933 F.3d 1286, 1294-1295 (11th Cir. 2019), and

---

[7] Plaintiffs' strained interpretation would illogically apply only to FTCs, and not to foreign tax deductions, even though tax-paying shareholders of mutual funds that pay foreign taxes have a choice between the two.

viewed in context the word "credit" cannot bear the weight Plaintiffs place on it.

The full provisions state (with Plaintiffs' snippets underlined):

EXPENSE RATIO

There is an expense ratio for each kind of Unit of the Sub-account.  The expense ratio is composed of the Company's administrative maintenance charge ("AMC"), sales and service fee (if applicable), plus the charges and fees of any underlying mutual fund, trust or portfolio ("the underlying fund expense").  The Company's administrative maintenance charge will be reduced if the Company or an affiliate receives revenue from the underlying mutual fund, trust, portfolio, its underwriter or other fund-related sources.  Such revenue includes asset based distribution charges ("12b-1 fees") or sub-transfer agency fees or other fund fees, plus (in the case of underlying funds, trusts, or portfolios that are affiliated with the Company) credits received by the Company that are attributable to the investment management fees paid to affiliates of the Company by the underlying investment vehicles….

ADMINISTRATIVE MAINTENANCE CHARGE, SALES AND SERVICE FEE, AND REVENUE FROM UNDERLYING FUNDS

For all Sub-accounts that are advised or sub-advised exclusively by a mutual fund, trust or portfolio, we receive revenue from the following sources:

1)    an Annual Maintenance Charge ("AMC")
2)    Sales and Service fee ("SSF"), if applicable
3)    fees (referred to as "revenue sharing," which includes the asset based distribution charges ("12b-1 fees") or sub-transfer agency fees or other fund fees described above) paid by the underlying mutual fund, trust or other fund related source to us for recordkeeping and other services provided to you by the Company, and
4)    in the case of an underlying mutual fund, trust, or portfolio affiliated with the Company, credits received by the Company that are attributable to the investment management fees paid to affiliates of the Company by such underlying investment vehicle.

> The revenue sharing as well as the credits that the Company receives in respect of an underlying investment vehicle affiliated with the Company are sometimes generically referred to as "revenue from underlying fund." The amount of revenue received by the Company from the underlying vehicle varies from Fund to Fund. The Company uses all revenue received from the underlying mutual fund, trust or portfolio to reduce the AMC for the Sub-account such that the sum of such revenue from the underlying mutual fund, trust or portfolio and the AMC is equal to 0.60% of your Contract assets invested in each Sub-Account….

SApp139-140.

These provisions describe when John Hancock will reduce its service fee by "revenue sharing" payments that it receives *from mutual funds* as compensation for the recordkeeping services that John Hancock provides to its clients (and thus that the mutual funds do not have to provide themselves). App.339 at 15, 68. For underlying mutual funds managed by a John Hancock entity, *i.e.*, "affiliated" funds, paragraph 4 describes the revenues shared with John Hancock as "credits received by the Company that are attributable to the [fund's] investment management fees." For unaffiliated mutual funds, *e.g.*, mutual funds managed by Vanguard or Fidelity, paragraph 3 describes the revenues shared with John Hancock as "fees … paid by the underlying mutual fund." Together, these substantively identical revenue-sharing fees and credits are, the Contract says, "generically referred to as 'revenue from underlying fund.'" SApp140. But the Contract consistently refers to these fees and credits specifically as revenues "*paid*" *by* the Plan's "*underlying*" *mutual funds* or *investments*. *See id.* (emphasis added).

27

The Fund Information Guide underscores this reading.  It describes how "John Hancock may receive fees (often referred to as 'revenue sharing') *from the underlying mutual fund or trust* for recordkeeping and other services provided to you by John Hancock on behalf of the underlying mutual fund or trust."  SApp253 (emphasis added).  It likewise states that "John Hancock uses these fees to reduce the [AMC] described below," and emphasizes that "[f]or Funds *where the underlying mutual fund or trust pay John Hancock* 'revenue sharing' fees (described above), the [AMC] is reduced."  SApp253-254 (emphasis added).

These provisions make no sense if "credits" includes FTCs—tax attributes that are not "paid by" or "attributable to … investment management fees paid … by" a mutual fund.  Indeed, the "credits" language Plaintiffs rely on in numbered paragraph 4 of the Contract refers explicitly to "credits" *received in connection with* affiliated mutual funds—but Plaintiffs have never offered any argument, evidence, or damages theory specific to FTCs in connection with only *affiliated* funds.  Thus, there is no "clear contractual language" conferring rights to the Plan in FTCs or their supposed monetary value.  *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1015 (11th Cir. 2003).[8]

---

[8] The Contract language is not ambiguous but even if it were, Plaintiffs are wrong that it should be construed against the drafter.  *See* Opening Br. 29.  This Court has cautioned that, "without clear contractual language[,] it is improper to impute fiduciary responsibility."  *ITPE Pension Fund*, 334 F.3d at 1015 (declining to "employ [a] broad construction to render ambiguous contractual language clear").

### 3. John Hancock's purported non-disclosure of FTCs does not convert them into plan assets.

Plaintiffs also argue that because John Hancock did not disclose FTCs as recordkeeping compensation on DOL-required disclosures, it permitted a "reasonable inference" that John Hancock "was not receiving the FTCs as compensation, but instead was passing their benefit to the Plans." Opening Br. 29-30. This theory fails three times over.

First, Plaintiffs forfeited this argument by not raising it below. *See In re Daikin Miami Overseas, Inc.*, 868 F.2d 1201, 1207 (11th Cir. 1989). Plaintiffs initially raised a separate claim premised on John Hancock's alleged failure to disclose FTCs, but later abandoned it—after, as the district court documented, changing the basis for the claim three times. *See* App.339 at 28-37. Even among these theories, Plaintiffs never argued that non-disclosure of FTCs demonstrates that FTCs are plan assets. *See* App.225-1 at 22-23. And it would be particularly inappropriate to allow Plaintiffs to smuggle this new theory in now because it would have required fact-finding about how plan trustees and participants understood the alleged non-disclosure. *See Daikin*, 868 F.2d at 1207 (factual questions are not properly addressed for the first time on appeal).

---

In Plaintiffs' cited decision, this Court applied the rule of contra proferentem when resolving the appropriate scope of covered dental procedures under a health plan—not the scope of fiduciary status. *See Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1551 (11th Cir. 1994).

Second, John Hancock was not required to disclose FTCs, so Plaintiffs could not have reasonably determined that the non-disclosure signaled any intent to rebate money to the Plan.  The regulations require the disclosure of "compensation" a recordkeeper "expects to receive *in connection with* the services" it provides, either from the plan itself ("direct compensation") or from another payor ("indirect compensation").  29 C.F.R. § 2550.408b-2(c)(1)(iv)(C) (emphasis added); 75 Fed. Reg. 41,600, 41,607, 41,609 (July 16, 2010).[9]  FTCs do not fit the bill:  they are tax attributes arising from the Code; the IRS does not pay John Hancock "compensation" for recordkeeping services.  Moreover, the Code allows FTCs from John Hancock's *ownership* of mutual fund shares in its separate accounts, not its role as a recordkeeper.  Indeed, John Hancock could apply FTCs by virtue of the Plan's decision to select John Hancock separate accounts, regardless of whether it provided recordkeeping services to the Plan.

And third, whether or not FTCs could constitute disclosable compensation, Plaintiffs do not explain how that is relevant to whether FTCs are plan assets. Plaintiffs cite nothing in support of their plan-assets-by-inference theory—nor is John Hancock aware of any authority suggesting that the disclosure or non-disclosure of something as compensation determines its status as a plan asset.

---

[9] Plaintiffs erroneously cite 29 U.S.C. § 1108(b)(2)(B)(ii)(I)(dd)(AA) and (iii)(III), which govern "group health plan[s]," *id.* § 1108(b)(2)(B)(ii)(I)(aa).

### 4.    The "source" of FTCs does not make them plan assets.

Plaintiffs' final theory is that FTCs are plan assets because they are generally "attributable to participant contributions"—or, put slightly differently, "generated by and flowing from plan contributions."  Opening Br. 31-32.  This theory would again work an unprecedented expansion in the scope of plan assets (and, by extension, fiduciary status):  service providers would be fiduciaries with respect to *any* activities they take in connection with a retirement plan, all of which involve some benefits "attributable to participant contributions."

In contrast, a series of circuits have held that a service provider's handling of participant contributions is insufficient to "confer[] plan-asset status on everything that comes within [its] possession" with respect to a plan.  *In re Fid. ERISA Float Litig.*, 829 F.3d 55, 60 (1st Cir. 2016).  In *Hecker v. Deere & Co.*, for example, the Seventh Circuit rejected the argument that revenue-sharing fees paid to a plan recordkeeper are plan assets.  As the court explained, the fees are "drawn from the assets of the mutual funds in question," which, by statute, are "not assets of the Plans."  556 F.3d 575, 584 (7th Cir. 2009).  And "[o]nce the fees are collected from the mutual fund's assets and transferred to one of the Fidelity entities, they become Fidelity's assets—again, not the assets of the Plans."  *Id.*  The fees in *Hecker* were, if anything, far more "attributable to participant contributions" than FTCs are:  unlike FTCs that might reduce John Hancock's tax obligation to the federal

government, the *Hecker* fees were actually paid by the mutual funds in which the plans invested. Regardless, they did not become plan assets merely because they could theoretically be traced to participant contributions.

The same was true in a pair of cases holding that "float"—interest earned on money a service provider holds for a delineated period of time—is not a plan asset. In *Tussey v. ABB, Inc.*, the Eighth Circuit rejected the argument that interest earned on money sitting in a depository account overnight was a plan asset. 746 F.3d 327, 339 (8th Cir. 2014). Though the income was, under the plaintiffs' theory, attributable to participant contributions, the court explained that the plan no longer had an ownership interest in those contributions once it "became the owner of the shares of the selected investment option" purchased with those contributions. *Id.*; *see also In re Fid. ERISA Float Litig.*, 829 F.3d at 58 (similar).[10] If, as Plaintiffs argue, any incidental benefits that were indirectly "attributable to participant contributions" were transformed into plan assets, then not only would these cases have turned out differently, but the Romanos' own *intentional* tax savings from

---

[10] Plaintiffs object to the district court's reliance on *Edmonson*'s plan-assets analysis, 725 F.3d at 426-429, but Plaintiffs' effort to distinguish the case makes little sense. Plaintiffs argue that, unlike the retained asset account at issue in *Edmonson*, "FTCs arose throughout a continuing relationship between Hancock and Plaintiffs." Opening Br. 35. Plaintiffs do not explain why that makes a difference for purposes of fiduciary status, nor do they consider that FTCs are attributable to the mutual fund's investments in a particular year—not some form of ongoing investment.

establishing the Plan[11] would be deemed plan assets.

Plaintiffs' proposed standard rests on misreading snippets of DOL guidance. Plaintiffs note, for example, that DOL has specified that "earnings on the contributions" and "retrospective rate credits" are understood as plan assets, but do not explain why FTCs fit either category. *See* Opening Br. 31 (quoting DOL, Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993)). Moreover, this Advisory Opinion *actually* explained that "earnings on … contributions" and "retrospective rate credits" qualify as plan assets *when held in trust* on behalf of the Plan—not the case here. And the Technical Release Plaintiffs cite (at 31) has nothing to do with the situation at hand. *See* Opening Br. 31 (quoting DOL Technical Release No. 2011-04 (Dec. 2, 2011)) (addressing how a health care plan allocates rebates it receives from issuers).

**\*\*\*\***

Under ERISA's text and structure (and common sense), John Hancock's corporate tax credits and deductions are not plan assets—they are not held in trust for participants, they cannot be distributed to pay out benefits, and they cannot be bought or sold like plan assets can be. They are instead inalienable features of the Code, and John Hancock did not provide its customers with a beneficial interest in

---

[11] SApp41(17:7-16), SApp47-48(53:18-54:11), SApp49-52(56:20-59:18); SApp98.

them when it promised to reduce its AMC by any revenue-sharing "fees" or "credits" it received from mutual funds.

**B.    John Hancock did not exercise discretionary authority or control respecting management of the Plan.**

In the alternative, Plaintiffs argue that John Hancock is a fiduciary under § 1002(21)(A)(i) as one who exercised discretionary authority over management of the Plan.  This argument also fails.  Service providers generally do not assume fiduciary duties with respect to their products or compensation, because "nothing prevent[s] the trustees from rejecting [the provider's] product and selecting another service provider; the choice [i]s theirs."  *Santomenno I*, 768 F.3d at 295.  And Plaintiffs' effort to bootstrap its FTC-related claims onto John Hancock's limited authority to hold assets in its separate accounts has likewise been rejected.  *See Leimkuehler*, 713 F.3d at 913; *see also Santomenno I*, 768 F.3d at 296.

**1.    Plaintiffs' attack on John Hancock's products and services is not the proper subject of a fiduciary-breach claim.**

When a service provider receives benefits by virtue of "its 'product design'— that is, the manner in which it craft[s] its menu of investment options and what funds … it elect[s] to include"—courts have consistently held that those product-design decisions do not render the service provider a fiduciary.  *Santomenno I*, 768 F.3d at 294; *accord Leimkuehler*, 713 F.3d at 911; *Santomenno v. Transamerica Life Ins. Co.* ("*Santomenno II*"), 883 F.3d 833, 838-839 (9th Cir. 2018); *In re Fid. ERISA*

*Fee Litig.*, 990 F.3d 50, 58 (1st Cir. 2021); *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1004 (8th Cir. 2016); *Fleming v. Fid. Mgmt. Tr. Co.*, 2017 WL 4225624, at *5 (D. Mass. Sept. 22, 2017); *Goetz v. Voya Fin., Inc.*, 2020 WL 550892, at *3 (D. Del. Feb. 4, 2020).[12]

In *Leimkuehler*, AUL offered a platform of investment options to 401(k) plans.  713 F.3d at 910.  AUL's choice of funds and share classes to include on that platform shaped the compensation that it would ultimately receive because certain funds or share classes would result in higher revenue-sharing payments to AUL.  *Id.* The district court rejected the plaintiffs' theory that these actions made AUL a fiduciary of the plan, and the Seventh Circuit affirmed.  *Id.* at 910.  The court held that the plaintiffs were effectively attacking "product-design" choices rather than fiduciary decisions over management of the plan or its assets; the plan sponsor, which was the *actual* plan fiduciary, "was free to seek a better deal with a different 401(k) service provider" if it was displeased with the insurer's product or its terms. *Id.* at 911-912.

That holding makes sense because "when a service provider and a plan trustee negotiate at arm's length over the terms of their agreement, discretionary control

---

[12] Plaintiffs suggest (at 45) that these cases are on questionable footing after *Hughes v. Northwestern University*, 142 S. Ct. 737, 742 (2022), but fiduciary status was not at issue in *Hughes*.

over plan management lies not with the service provider but with the trustee, who decides whether to agree to the service provider's terms." *Santomenno I*, 768 F.3d at 293; *see also Leimkuehler*, 713 F.3d at 911-912; *Malone v. TIAA*, 2017 WL 913699, at *5 (S.D.N.Y. Mar. 7, 2017) (rejecting contention that service provider's "undisclosed policy" of failing to share recordkeeping offsets made the service provider a fiduciary).

Under these decisions, John Hancock's application of FTCs on its own corporate tax filings did not give John Hancock discretion over *plan* management. Plaintiffs had "the final say on which investment options" to offer, and Plan participants made the decision to invest in funds with foreign securities. *Leimkuehler*, 713 F.3d at 911. Moreover, the mutual funds paying foreign taxes decided whether to make an election *requiring* John Hancock to include foreign taxes as grossed-up income on its U.S. tax returns. *See supra*, pp. 8-9; *see also* SApp516. John Hancock had no control over any of these decisions, which are what triggered the application of a corresponding FTC or deduction. App.339 at 18; SApp533(61:9-16); SApp537(88:15-17); *see* 26 U.S.C. §§ 901-909.

Like the plaintiffs in these cases, Plaintiffs are effectively attacking the structure and design of John Hancock's products and services. But the trustees of each plan had the discretion to select, negotiate for, and terminate those products and services; "the choice was theirs." *Santomenno I*, 768 F.3d at 295.

Plaintiffs contend that these cases are "inapplicable" because nothing in the Contract or RKA "authorizes Hancock to retain the benefit of FTCs." Opening Br. 44. That is entirely backwards. John Hancock was under no obligation to negotiate with the Plan to "authorize[] it to keep FTCs," Opening Br. 46-47, because, as Plaintiffs do not dispute, FTCs are tax attributes that can be applied only by John Hancock. The notion that a service provider becomes a fiduciary with respect to everything that is not spelled out in its service agreement, simply by virtue of the fact that a plan's *actual* fiduciaries failed to negotiate it, would turn fiduciary status on its head. *See Vander Luitgaren*, 765 F.3d at 65 (rejecting effort to read an additional requirement into plan documents).

The cases Plaintiffs cite (at 39-40 & n.10) provide no support for their fiduciary-by-contractual-silence rule. In all three, the defendants had or were exercising discretionary authority over functions that *were fiduciary in nature*. In *Harris Trust & Savings Bank v. John Hancock Mutual Life Insurance Co.*, 302 F.3d 18 (2d Cir. 2002), John Hancock (under a different product line for different plans using a different contractual arrangement) made investment decisions for numerous clients and allocated investment income and expenses among those clients in its discretion, without any guidance or requirements articulated in the contract. *Id.* at 22, 23, 31. It was a functional fiduciary because the *type of decisions it made* "represent[ed] the quintessential 'discretionary management' decisions." *Id.* The

same is true of *Peters v. Aetna Inc.*, 2 F.4th 199, 232 (4th Cir. 2021), in which the defendant had the discretion to spend the plan's money in "any amount," and *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, 961 F. Supp. 2d 393, 399 (D. Conn. 2013), in which the relevant contract vested the defendant with broad authority to make investment decisions "to accomplish the [plan's] purpose." Contrary to Plaintiffs' argument, contractual silence did not make the defendants plan fiduciaries; *possessing or exercising fiduciary authority over a plan* did. Filing corporate tax returns, and applying tax credits therein, are not plan-management functions, which is why their absence from the Contract is hardly conspicuous.

Plaintiffs nevertheless maintain that John Hancock could have bestowed "a commensurate benefit to the Plan." Opening Br. 44; *accord id.* at 54. In other words, John Hancock was a fiduciary because it might have negotiated a contractual arrangement that was more favorable to the Plan. That theory would eviscerate any limits on fiduciary status for insurance companies maintaining separate accounts. John Hancock *might* have offered to rebate the value of FTCs,[13] just as it *might* have charged the Plan less in fees or agreed to give the Plan a credit if profits passed a particular threshold. But as courts have repeatedly recognized, an insurer is "not an

---

[13] Indeed, that is precisely what another financial-services company, Securian, advertises as a marketing strategy. The Romanos' investment advisor received Securian's solicitation but chose not to recommend Securian to the Romanos. App.339 at 9-10.

ERISA fiduciary when negotiating" its arrangement with a plan. *Santomenno II*, 883 F.3d at 837-838 ("agree[ing]" with "three of [the court's] sister Circuits"). Rather, during negotiations, "discretionary control over plan management lies … with the trustee, who decides whether to agree to the service provider's terms." *Santomenno I*, 768 F.3d at 293; *see also Hecker*, 556 F.3d at 583.

By contrast, Plaintiffs' cases involve service providers that negotiated to retain discretion over the factors that determined their compensation. Opening Br. 38-40. Even putting aside that tax attributes are not compensation, *see supra* p. 30, these cases expressly recognize that when someone is "negotiating a contract" with a plan he is "not an ERISA fiduciary with respect to the terms of the agreement for his compensation"; it is only if a service provider has negotiated an agreement that gives him "control over factors that determine the actual amount of [his] compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation." *F.H. Krear*, 810 F.2d at 1259 (emphasis added); *Golden Star, Inc. v. Mass Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 81 (D. Mass. 2014) (same). John Hancock, in contrast, had no control over any of the factors that would lead to FTCs being generated under the Code.

> **2.    John Hancock's limited authority to "hold[] plan assets in its separate accounts" and act on "directions from trustee[s], participants and beneficiaries" does not support Plaintiffs' fiduciary-status arguments.**

Plaintiffs assert (at 36) that John Hancock "conceded its fiduciary status in the

RKA" by noting that it was a "limited fiduciary for the exclusive purposes of holding plan assets in its separate account[s]." App.110-1 at 2.[14]  The district court correctly rejected this theory.  App.339 at 54-58.  Plaintiffs' argument is once again based on a selective misreading of the relevant agreement—Plaintiffs omit the language of the RKA that demonstrates precisely how circumscribed John Hancock's obligations were:

> To the extent John Hancock maintains a separate account(s) in which the plan invests, John Hancock is a limited fiduciary for the exclusive purposes of holding plan assets in its separate account(s), voting proxies, and acting only in accordance with directions from trustee(s), participants and beneficiaries ….  John Hancock will not have any discretionary authority or responsibility for the management or control of the separate accounts.

App.110-1 at 2.[15]  The plain text of this provision cabins the scope of any fiduciary responsibility: John Hancock merely had the obligation to hold assets, vote proxies, and follow participants' investment instructions.  It might, therefore, be liable for a fiduciary breach if it "mismanaged the separate account—say, by losing track of participants' contributions or withdrawing funds in the separate account to pay for a company-wide vacation to Las Vegas." *Leimkuehler*, 713 F.3d at 913.  But as a

---

[14] Plaintiffs' cited regulation merely echoes this responsibility.  *See* 29 C.F.R. § 2550.401c-1.

[15] The district court expressly held that this authority *was ministerial and administrative*, not fiduciary.  App.339 at 48-49.  Plaintiffs' brief does not challenge that conclusion.

series of circuits have recognized, John Hancock's "control over the separate account can support a finding of fiduciary status *only if* [Plaintiffs'] claims for breach of fiduciary duty arise from [John Hancock's] handling of the separate account." *Id*. (emphasis added).

Plaintiffs, however, do not suggest that John Hancock "in any way mismanaged the separate account." *Id.* As the district court noted, John Hancock held the assets in the separate account "exactly as instructed." App.339 at 57. Plaintiffs' argument is instead that, after satisfying its obligation to move assets into mutual funds that invested in foreign securities, John Hancock became a fiduciary over its tax filings and breached those fiduciary obligations by failing to bestow upon Plaintiffs the value of tax attributes created by the Code. *See id.* This is precisely the type of expansive theory rejected in *Leimkuehler*. Because there is no "'nexus' between the alleged basis for fiduciary responsibility" (holding assets in separate accounts) "and the wrongdoing alleged in the complaint" (the application of FTCs on John Hancock's tax filings), this argument fails. *McCaffree Fin. Corp.*, 811 F.3d at 1002.

Plaintiffs pejoratively refer to the relevant contractual language as an "ineffective disclaimer[]." Opening Br. 47. But the provision does not *disclaim* fiduciary authority that was actually being exercised—it *defines the scope* of authority being vested in John Hancock, which is wholly appropriate given ERISA's

functional-fiduciary definition.  The statute is clear that "an entity is only a fiduciary to the extent it possesses authority or discretionary control over the plan," and even then only "with respect to the particular activity in question."  *Renfro v. Unisys Corp.*, 671 F.3d 314, 321 (3d Cir. 2011) (citing 29 U.S.C. § 1002(21)(A)).   Thus, as the district court correctly understood, "[t]he 'limited fiduciary' status John Hancock contracted for must be read in context of its entire agreement."  App.339 at 55.  Because service providers like John Hancock generally are not considered plan fiduciaries, *see supra* p. 20, it is critical for them to have clarity that serving as a fiduciary for a *limited purpose* will not cause them to become fiduciaries for every action they take.  *See, e.g.*, *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 653 (9th Cir. 2019); *Santomenno I*, 768 F.3d at 291.  Plaintiffs' approach would eviscerate this aspect of ERISA.[16]

### 3.    John Hancock's "control over" its corporate tax deductions or credits is irrelevant to fiduciary status under ERISA.

Finally, Plaintiffs' reliance on John Hancock's "complete control over FTCs" provides no basis for reversal.  Opening Br. 44.  First, Plaintiffs' characterization is dubious at best.  As the district court held, discretionary decisions by the Romanos, Plan participants, and mutual funds triggered the application of tax credits.  App.339

---

[16] Plaintiffs are therefore wrong that the district court was "erroneously chopping the challenged conduct into unrecognizable pieces."  Opening Br. 40.  To the contrary, it was simply applying ERISA's "to the extent" language as courts have consistently done.  *See supra* pp. 19-21.

at 51-52; *see supra* pp. 8-9. John Hancock had no control over any of those decisions, and Plaintiffs have never even suggested that John Hancock tried to *influence* those decisions by, for example, urging its customers to invest in particular funds or asking mutual funds to make a gross-up election.

Second, a company is not a fiduciary when "conduct[ing] business that is not regulated by ERISA." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1283 (11th Cir. 2012). What matters is whether one exercises "control respecting *management of [a] plan*," 29 U.S.C. § 1002(21)(A)(i) (emphasis added), not whether it exercises control respecting corporate operations.[17] And here, John Hancock's control—to the extent it has any—falls squarely within the latter category. At most, John Hancock has control only over the final step in the process: actually *applying* the tax credit created by the Code.

John Hancock takes this step acting in its capacity as taxpayer, in compliance

---

[17] Plaintiffs object that the district court misinterpreted *Lanfear* by "transform[ing]" the fiduciary act of holding plan assets "to a non-fiduciary business function of completing its taxes." Opening Br. 42. Not so. As discussed above, John Hancock's act of holding Plan assets as a limited fiduciary over separate accounts is not the "action subject to complaint." *Pegram*, 530 U.S. at 226. John Hancock's consolidated corporate tax filings are the subject of complaint, and those filings are not regulated by ERISA. Plaintiffs also attempt to distinguish *Lanfear* on the ground that, unlike the filing of securities paperwork, "FTCs here would not have flowed to Hancock but for its ERISA fiduciary functions." Opening Br. 42. Again, incorrect, as FTCs arose from the decisions of others. Moreover, Plaintiffs' vague traceability rule would nullify ERISA's tailored functional-fiduciary standard.

with U.S. tax laws—not while conducting activity in an ERISA fiduciary capacity. John Hancock's U.S. Tax group prepares a single consolidated tax return that covers all of its business units.  App.339 at 19; SApp532(26:1-25).  And when it does so, it applies all applicable rules across the consolidated set of companies.  In particular, in applying FTCs John Hancock's U.S. Tax group follows Internal Revenue Service ("IRS") Private Letter Ruling 9528004, 1995 WL 414084 (Mar. 29, 1995), which states that an insurer that maintains separate accounts for qualified benefit plans "may claim a foreign tax credit … for any foreign taxes creditable under section 901 that are paid or accrued with respect to foreign source income attributable to the separate account, without reduction for an amount equal to the foreign taxes attributable to the policyholders' share of such separate account's foreign source income."  SApp546-547; App.339 at 19.

Thus, at best John Hancock has control with respect to corporate operations, which do not trigger ERISA fiduciary status.

## III.   John Hancock is entitled to summary judgment on the independent basis that there was no breach of fiduciary duty.

The district court granted summary judgment to John Hancock on a second, separate basis:  Plaintiffs failed to establish a dispute of material fact about whether John Hancock breached any duties and engaged in a prohibited transaction. Plaintiffs incorrectly suggest (at 48) that this ruling rested solely on the district court's conclusion that John Hancock was not an ERISA fiduciary.  But while the

district court recognized that John Hancock could not breach fiduciary duties it did not owe, the court "also evaluate[d] the claims that John Hancock was in breach for allegedly acting disloyally and for engaging in a prohibited transaction." App.339 at 66. On both, the court determined that John Hancock was entitled to summary judgment.

### A. John Hancock did not act disloyally.

John Hancock did not breach the duty of loyalty under 29 U.S.C. § 1104(a)(1)(A), because participants received the benefits to which they were entitled under the Plan, and John Hancock's actions did "not unfairly diminish, impair, restrict, or burden the beneficiary's rights …" *Vander Luitgaren*, 765 F.3d at 65. To establish disloyalty, a plaintiff must do more than show that a defendant obtained some benefit: "ERISA section 404(a) does not require a fiduciary to don the commercial equivalent of sackcloth and ashes." *Id.* "It is no violation of a trustee's fiduciary duties to take a course of action which reasonably best promotes the interest of plan participants simply because it incidentally also benefits the corporation." *Morse v. Stanley*, 732 F.2d 1139, 1146 (2d Cir. 1984). Rather, a plaintiff must show that the defendant's actions with respect to an ERISA plan "were motivated by disloyal reasons." *Allen*, 967 F.3d at 776; *see also Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 40 (1st Cir. 2018) (requiring evidence of actual disloyal conduct or "specific instances of disloyalty" by plan fiduciaries).

Applying these principles, the First Circuit held that an insurer did not violate the duty of loyalty by retaining interest earned on participants' unliquidated death benefits. *Vander Luitgaren*, 765 F.3d at 65. As the court explained, ERISA does not require that a fiduciary forgo all profit, but rather that it "not place its own interests ahead of those of the Plan beneficiary" when providing plan benefits. *Id.* To illustrate, the court posited a plan that "specifies that the death benefit may be paid other than in American dollars." *Id.* "If, in a particular case, it makes no practical difference to the beneficiary whether she receives her promised benefit in dollars or euros, but it is to the fiduciary's advantage to pay in euros, it could not rationally be argued that payment in euros was a breach of the fiduciary's duty under section 404(a)." *Id.* Under that logic, the fiduciary insurance company did not violate ERISA when it chose to pay benefits through a retained asset account that allowed it to earn income on funds before they were withdrawn. *See id.*

The same is true here. Plaintiffs obtained precisely what they bargained for: John Hancock's recordkeeping services at an agreed-upon price, and the opportunity to invest through the John Hancock platform in sub-accounts holding pre-specified mutual funds whose value would be determined based on the fund's NAV, which is net of foreign taxes paid. *See supra*, p. 6. While Plaintiffs object (at 50) that compliance with both the parties' Contract and the Code is "beside the point," this consideration is highly relevant to whether John Hancock "diminish[ed], impair[ed],

46

restrict[ed], or burden[ed]" the rights of participants. *Vander Luitgaren*, 765 F.3d at 65 (noting repeatedly that the fiduciary complied with the terms of the Plan). The Plan could not offset its investments' foreign tax payments by applying FTCs to the Plan's tax obligations (of which there was none)—meaning it made "no practical difference" to the Plan whether John Hancock applied FTCs to reduce its own tax liability. *Id.* Nor did Plaintiffs present any "record evidence" that John Hancock had a subjectively disloyal intent in its dealings with the Plan, or funneled Plan participants into investments in foreign securities in order to obtain FTCs. App.339 at 67.[18]

Plaintiffs ignore *Vander Luitgaren*, which was cited extensively by the district court, maintaining instead (at 48-49) that the duty of loyalty requires that fiduciaries always adhere to an unyielding "eye single" standard with respect to beneficiaries' interests. This standard is drawn from trust law, *see Donovan v. Bierwirth*, 680 F.2d 263, 271 (7th Cir. 1982), but, in the context of ERISA, "trust law does not tell the

---

[18] Plaintiffs' cited cases are easily distinguishable, as both involved affirmative misuse of participant funds. In *Guyan International, Inc. v. Professional Benefits Administrators, Inc.*, 689 F.3d 793, 799 (6th Cir. 2012), a claims administrator used participant funds for its own purpose rather than to pay medical claims—leaving "hundreds of thousands of dollars of unpaid claims and the concomitant harm to Plan participants." *Felber v. Est. of Regan*, 117 F.3d 1084, 1086-1088 (8th Cir. 1997), is even less illuminating. There, the plan trustee did not appeal the district court's conclusion that he had engaged in self-dealing that resulted in a fiduciary breach; the decision focused solely on remedy.

entire story," *Varity Corp. v . Howe*, 516 U.S. 489, 497 (1996).  While common-law trust principles prohibit trustees from profiting in any way from work they perform for trust beneficiaries, ERISA does not.  Service providers are an apt example: ERISA allows insurers and other companies that provide administrative and recordkeeping services to be ERISA fiduciaries, even though they are fully expected to have a profit motive.  *See, e.g.*, *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).  Plaintiffs make no attempt to satisfy the proper standard, *see supra*, p. 47, and they have therefore failed to show that the district court erred.

### B.    John Hancock did not commit prohibited transactions.

Plaintiffs' argument that the district court erred in granting summary judgment on Plaintiffs' claim under 29 U.S.C. § 1106(b)(1) is entirely derivative of its plan-assets argument and thus fails for the reasons described above.  Opening Br. 53.  It also fails because Plaintiffs ignored that the district court offered an *independent basis* for rejecting Plaintiffs' prohibited-transaction claim: it held that "[e]ven if" John Hancock was a relevant fiduciary, it did not violate ERISA's prohibited-transaction provisions because it "took no active steps to be entitled to FTCs," as required by the active "deal[ing] with [plan] assets" language included in § 1106(b)(1).  App.339 at 72-73 (collecting cases).  Plaintiffs do not attempt to address this alternative ground and have therefore forfeited this issue on appeal.  *See United States v. Richardson*, 518 F. App'x 708, 710 (11th Cir. 2013).

**IV.  The district court properly granted summary judgment based on Plaintiffs' failure to produce evidence of loss causation.**

Summary judgment was also appropriate because Plaintiffs demonstrated no losses to the Plan.  "The entire statutory scheme of ERISA demonstrates that Congress' overriding concern in enacting the law was to insure that the assets of benefit funds were protected for plan beneficiaries." *Brock v. Robbins*, 830 F.2d 640, 647 (7th Cir. 1987).  In line with this goal, fiduciaries can be held liable for "any losses to the plan resulting from" a breach.  29 U.S.C. § 1109(a); *see also Willett*, 953 F.2d at 1343 ("requir[ing] that the breach of the fiduciary duty be the proximate cause of the losses claimed"); *Useden v. Acker*, 947 F.2d 1563, 1576 n.17 (11th Cir. 1991) (rejecting a claim of fiduciary liability where the record was "devoid of facts indicating that" the alleged breach could "be causally linked to any damages suffered by the Plan").  Because a breach of duty "does not automatically equate to causation of loss and therefore liability," a plaintiff must establish that a breach in fact resulted in loss to a plan. *Plasterers' Loc. Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 217 (4th Cir. 2011); *see also Brock*, 830 F.2d at 647.

Plaintiffs failed to make that showing.  The district court correctly determined that Plaintiffs' only relevant evidence—testimony from Plaintiffs' expert Barry Mukamal—showed "'monetary benefit' *to* John Hancock, not damages incurred *by* Plaintiffs."  App.339 at 74; *see also* Opening Br. 53-55. Plaintiffs acknowledge that they are conflating the two, asserting (at 54) that Mr. Mukamal's "testimony

establishes both the profit that Hancock earned from its disloyal conduct and the losses that Plaintiffs suffered." But as this Court has explained, there is a "fundamental difference between" damages, which "is measured by the plaintiff's loss," and restitution and disgorgement, which are "measured by the defendant's gain." *AcryliCon USA, LLC*, 985 F.3d at 1368 (discussing Dan B. Dobbs, *Law of Remedies* § 4.1(1), at 555 (2d ed. 1993)). Because damages are a measure of compensation for injury, Plaintiffs cannot simply toggle back and forth between the two. *See id.* (vacating a damages award where the plaintiff failed to establish loss).[19]

Pivoting on appeal, Plaintiffs assert that they are entitled to disgorgement of John Hancock's profits. Opening Br. 54-55. But Plaintiffs forfeited this argument—twice. The district court expressly held that Plaintiffs forfeited this argument below, App.339 at 76 n.26, but Plaintiffs make no mention of that finding nor explain why it was an abuse of discretion. *See Veolia Water N. Am. Operating Servs., LLC v. City of Atlanta*, 546 F. App'x 820, 824 (11th Cir. 2013) (standard of review of district court forfeiture determinations).

Nor do Plaintiffs offer any authorities to support this theory of recovery on appeal. They rely on *Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 914 (11th Cir. 2022), which recognized only that equitable surcharge is an available remedy for breach of

---

[19] Contrary to Plaintiffs' assertion (at 53-54), the district court held expressly that this was an independent basis for summary judgment. App.339 at 75, 77.

fiduciary duty. But equitable surcharge *is* expressly a measure of loss—not disgorgement. *Id.*

## V.    If this Court vacates the district court's decision, it should reverse the district court's ruling that Plaintiffs are entitled to a jury trial.

If this Court does not affirm the judgment below, it should reverse the district court's conclusion that Plaintiffs are entitled to a jury trial on their claims under 29 U.S.C. § 1132(a)(2). ERISA itself does not expressly include any right to trial by jury, and this Court has repeatedly stated that ERISA claims generally have no constitutional guarantee to a jury trial, including claims for fiduciary breach. *See, e.g.*, *Useden*, 947 F.2d at 1572 n.12 ("The ERISA claims in the present case  [for breach of fiduciary duty] do not entitle plaintiff to a jury trial."); *Rolland v. Textron, Inc.*, 300 F. App'x 635, 636 (11th Cir. 2008); *Stewart v. KHD Deutz of Am. Corp.*, 75 F.3d 1522, 1527 (11th Cir. 1996); *Mack v. Metro. Life Ins. Co.*, 246 F. App'x 594, 595 (11th Cir. 2007); *Broaddus v. Fla. Power Corp.*, 145 F.3d 1283, 1287 (11th Cir. 1998).

Although the district court characterized this Court's statements on the issue as dicta, SApp20, Supreme Court precedents, trust-law treatises, and decisions from other jurisdictions overwhelmingly demonstrate that these statements reflect an accurate view of the law. The Seventh Amendment guarantees a jury trial only for "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and

equitable remedies administered." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (citation omitted). And the Supreme Court has stated expressly, consistent with trust-law treatises, that fiduciary-breach claims seeking monetary remedies from a fiduciary are *equitable* claims seeking *equitable* relief. *See CIGNA Corp. v. Amara*, 563 U.S. 421 (2011). Accordingly, the "overwhelming weight of authority" holds that the Seventh Amendment guarantees no right of trial by jury in fiduciary-breach cases. *Williams v. Centerra Grp., LLC*, 579 F. Supp. 3d 778, 781-782 (D.S.C. 2022).[20] This Court should do so too.

### A.    The Seventh Amendment preserves the right to trial by jury where that right would have existed at common law.

ERISA establishes no express right to trial by jury and so the question before this Court is whether the constitution requires one. The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII.

---

[20] *Accord Tracey v. Mass. Inst. of Tech.*, 2019 WL 1005488, at *2 (Feb. 28, 2019) ("The great weight of authority holds that no right to trial by jury applies to actions for breach of fiduciary duty under ERISA.") (collecting cases), *report & recommendation adopted*, 395 F. Supp. 3d 150 (D. Mass. 2019); *Spano v. Boeing Co.*, 2007 WL 1149192, at *8 (S.D. Ill. Apr. 18, 2007) (similar); *see, e.g.*, *Divane v. Nw. Univ.*, 953 F.3d 980, 993-994 (7th Cir. 2020), *vacated and remanded on other grounds sub nom. Hughes v. Nw. Univ.*, 142 S. Ct. 737 (2022); *Moitoso v. FMR LLC*, 410 F. Supp. 3d 320, 322 (D. Mass. 2019); *Perez v. Silva*, 185 F. Supp. 3d 698, 699 (D. Md. 2016); *Pledger v. Reliance Tr. Co.*, 2017 WL 11568409, at *1 (N.D. Ga. Nov. 7, 2017); *Henderson v. Emory Univ.*, 2018 WL 11350441, at *3 (N.D. Ga. Feb. 28, 2018), *Bauer-Ramazani v. TIAA-CREF*, 2013 WL 6189802, at *11 (D. Vt. Nov. 27, 2013).

To determine whether the Seventh Amendment "preserves" a right to jury trial in a statute that did not exist at ratification, this Court must determine whether Plaintiffs sought "to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Granfinanciera*, 492 U.S. at 41-42.

The Supreme Court has established a two-part test for this inquiry. First, one must "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Id.* at 42 (citation omitted). Second, one must "examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* (citation omitted). The second step is considered the "more important," but the "two factors" are "balance[d]" in evaluating whether a jury-trial right exists. *Id.*

Plaintiffs asserted claims under 29 U.S.C. § 1132(a)(2),[21] which allows ERISA plaintiffs to seek "appropriate relief under section 1109." Section 1109 provides, in relevant part that a plan fiduciary "who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting

---

[21] Plaintiffs agreed below that they have no jury-trial right for their § 1132(a)(3) claim. SApp3.

from each such breach." 29 U.S.C. § 1109(a). Relying on these provisions, Plaintiffs sought to hold John Hancock "liable to personally make good to the Plan any losses to the Plan resulting from" each alleged fiduciary breach or prohibited transaction. SApp14.

It is uncontested that the first *Granfinanciera* factor favors John Hancock, and the great weight of authority holds that the second factor does as well. Thus, "on balance, these two factors indicate" that no right to trial by jury was preserved by the Seventh Amendment. 492 U.S. at 42.

**B.** ***Granfinanciera* Step 1: It is undisputed that the analogous action would have been deemed equitable prior to the merger of law and equity.**

The district court held that *Granfinanciera*'s first step does not support a jury trial. SApp21. Plaintiffs conceded this point below, SApp3, and for good reason: the Supreme Court has repeatedly recognized that the analogous common-law claims—fiduciary-breach claims against a trustee—"were within the exclusive jurisdiction of courts of equity." *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 567 (1990) (citing 2 Joseph Story, *Commentaries on Equity Jurisprudence* § 960 (13th ed. 1886); Restatement (Second) of Trusts § 199(c) (1959)); *Amara*, 563 U.S. at 440. As far as John Hancock is aware, every court to have considered this factor—even those cited by the district court as holding that there is a jury trial for fiduciary-breach claims—has concluded that it does not favor

a jury-trial right in ERISA cases. *See, e.g.*, *Kirse v. McCullough*, 2005 WL 6797091, at *1 (W.D. Mo. May 12, 2005); *Hellman v. Catalado*, 2013 WL 4482889, at *1 (E.D. Mo. Aug. 20, 2013); *Chao v. Meixner*, 2007 WL 4225069, at *3 (N.D. Ga. Nov. 27, 2007).

### C. *Granfinanciera* Step 2: The make-whole monetary relief sought by Plaintiffs for an alleged violation of a breach of trust is an equitable remedy.

The Supreme Court and trust treatises agree: claims seeking monetary remedies from a trustee or fiduciary for breaches of the duties imposed on fiduciaries are equitable claims *seeking equitable remedies*. A straightforward application of this established principle compels the conclusion that *Granfinanciera* Step 2 does not favor a constitutional right to jury trial.

1.    The Supreme Court squarely addressed the nature of the remedies at issue here in *Amara*, 563 U.S. 421. Canvassing established trust treatises and common-law trust cases from the 18th and early 19th centuries, the Court observed that "prior to the merger of law and equity," monetary remedies sought against a fiduciary for a breach of trust were considered "exclusively equitable." *Amara*, 563 U.S. at 442 (quoting *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 464 (1939)). This equitable remedy, "sometimes called a 'surcharge,'" "extended to a breach of trust committed by a fiduciary encompassing *any* violation of a duty imposed upon that fiduciary." *Id*. Because equity courts considered this remedy to

be exclusively equitable, the Court held, "the fact that this relief takes the form of a money payment does not remove it from the category of traditionally equitable relief." *Id.* at 441.[22]

The Court's analysis is supported by well-established trust treatises. The most recent Restatement of Trusts, for example, recognizes that the remedies available to trust beneficiaries against breaching fiduciaries are, "[w]ith limited exceptions, … equitable in character." Restatement (Third) of Trusts § 95 (2012), *cited in Amara*, 563 U.S. at 441-442; *see also id.* at Comment a ("The remedies of, or on behalf of, trust beneficiaries are, with limited exceptions …, equitable in nature (*typically, for example, without jury trial*) and granted against trustees by courts of chancery or other courts exercising equity powers." (emphasis added)).

The Second Restatement of Trusts (in effect at ERISA's enactment) spells this out in even more detail. Restatement (Second) of Trusts §§ 197-199 (1959), *cited in Amara*, 563 U.S. at 442. Section 197, titled "Nature of Remedies of Beneficiary," provides: "Except as stated in § 198, the remedies of the beneficiary against the trustee are exclusively equitable." And § 199, titled "Equitable Remedies of Beneficiary," lists among the exclusively *equitable* remedies available:

---

[22] This Court's precedents have reached a similar conclusion in the jury-trial context with respect to monetary requests for backpay under Title VII. *See Johnson v. Ga. Highway Express, Inc.*, 417 F.2d 1122, 1125 (5th Cir. 1969); *Harkless v. Sweeny Indep. Sch. Dist.*, 427 F.2d 319, 324 (5th Cir. 1970).

"compel[ing] the trustee to redress a breach of trust," *id.* § 199(c) (cross-referencing § 205, which includes a monetary award of "(a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust," *id.* § 205).

The two exceptions are listed in § 198, titled "Legal Remedies of Beneficiary." Those *legal* remedies include the beneficiary's right to maintain an action at law to enforce payment of money where "the trustee is under a duty to pay money immediately and unconditionally to the beneficiary"—*i.e.*, where equitable considerations play no role. *Id.* § 198(1). *Bogert's Law of Trusts and Trustees*, another prominent trust, describes the nature of the remedies in the same way, including the same narrow exception for sums certain. *Bogert's Law of Trusts & Trustees* § 870 (describing "Relief in Equity" and "Occasional Grant of Remedy at Law").

2.    Although the *Granfinanciera* test focuses on common-law principles, the relevant provisions of ERISA are consistent with *Amara*'s historical understanding. The provision upon which Plaintiffs have relied provides that fiduciaries shall be liable for "any losses to the plan resulting from each [fiduciary] breach, and to restore to such plan any profits of such fiduciary …, and shall be subject to *such other* equitable or remedial relief as the court may deem appropriate,

including removal of such fiduciary."  29 U.S.C. § 1109(a) (emphasis added).

That Congress grouped recovery of losses and disgorgement of profits with "*other* equitable or remedial relief" that courts could award reflects Congress's understanding that the specifically articulated forms of monetary relief *were* considered equitable under the common law of trusts, from which ERISA derives. *Amara*, 563 U.S. at 439; *see also Mertens*, 508 U.S. at 264 ("ERISA … abounds with the language and terminology of trust law and must be construed against the background of the common law of trusts." (quotation marks omitted)).  Congress knows how to expressly authorize remedies at law when it wants to—in other sections, inapplicable here, it specifically provided for "such other *legal* or equitable relief as the court deems appropriate."  *E.g.*, 29 U.S.C. § 1132(g)(2)(E) (emphasis added); *see Moitoso*, 410 F. Supp. 3d at 331 & n.6 (noting these distinctions among ERISA's various relief provisions).  It did not do so in §§ 1132(a)(2) and 1109(a)—instead, it made available remedies against a breaching fiduciary that match the *equitable* remedies of beneficiaries recognized by the trust treatises described above.[23]

     3.    Lower courts across the country that have analyzed these precedents,

---

[23] Congress originally proposed a remedy provision that made available "'legal or equitable' relief."  *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985).  That "reference to legal relief was deleted," however, before enactment.  *See id.*

treatises, and ERISA's text in depth overwhelmingly agree that the monetary relief available against fiduciaries in § 1109(a) is exclusively equitable. *See, e.g.*, *Moitoso*, 410 F. Supp. 3d at 322-331 (reaching this conclusion "after close study of historical practice and ERISA's text"); *Tracey*, 395 F. Supp. 3d at 151-154 (reviewing magistrate judge's extensive analysis, 2019 WL 1005488, at *2-4); *Silva*, 185 F. Supp. 3d at 700-704; *Williams*, 579 F. Supp. 3d at 782-785; *Bauer-Ramazani*, 2013 WL 6189802, at *11; *see also supra* p. 51-52 & n.20.[24]

And while "a handful of courts" cited by the district court here (SApp23) "have concluded otherwise," *Silva*, 185 F. Supp. 3d at 705 n.13, those decisions predated or simply ignored the Supreme Court's analysis of the issue in *Amara*—as several district courts that have declined to follow the minority view have observed. *See, e.g.*, *See Silva*, 185 F. Supp. 3d at 705 n.13; *Henderson*, 2018 WL 11350441, at *6 n.5; *George v. Kraft Foods Glob., Inc.*, 2008 WL 780629, at *5 (N.D. Ill. Mar. 20, 2008); *Canestri v. NYSA-ILA Pension Tr. Fund & Plan*, 2009 WL 3698111, at *1 (D.N.J. Nov. 5, 2009).

---

[24] The district court disregarded *Silva* on the ground that it "relied solely on two non-binding trial-level decisions." SApp31. That is not accurate—*Silva* relied on Supreme Court precedent, trust treatises, and about a dozen district-court cases constituting the "clear weight of authority, as courts sitting nationwide have repeatedly held … that claims under section 502(a)(2) do not implicate the Seventh Amendment's jury guarantee." 185 F. Supp. 3d at 700-705.

**D.    The district court's contrary holding, which disregarded *Amara* and erroneously relied on lower-court authority that predated or ignored *Amara*, was erroneous.**

In reaching a contrary conclusion, the district court relied primarily on the fact that Plaintiffs sought a money judgment, which the court characterized as "damages" and therefore "legal relief," citing *Great–West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), and *Mertens*, 508 U.S. 248. *See* SApp24-26.  But *Amara* addressed this precise issue:  "the fact that … relief takes the form of a money payment does not remove it from the category of traditionally equitable relief. Equity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment."  563 U.S. at 441; *accord N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 134-135 (2d Cir. 2015).

*Amara* also explained why the district court's reliance on *Mertens* and *Great-West*—along with a later similar case, *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136 (2016)—was mistaken.  These cases were about whether claims for monetary relief brought *by a fiduciary* against *a non-fiduciary* are equitable.  *See Mertens*, 508 U.S. at 251-263.  Those are not claims for equitable remedies—the remedy of "surcharge" applied only to breaching *fiduciaries*—but rather for "compensatory damages against a nonfiduciary," which, "traditionally speaking, was legal, not equitable, in nature."  *Amara*, 563 U.S. at 439

(quotation marks omitted).  Thus, as the Court explicitly observed in *Amara*, the fact that an ERISA defendant "is analogous to a trustee makes a critical difference." *Id.* at 442.  These decisions provide no support for the district court's conclusion that a form of monetary relief typically available in equity—make-whole relief sought from a trustee for breach of trust—is legal.  *See Moitoso*, 410 F. Supp. 3d at 328; *Tracey*, 395 F. Supp. 3d at 153; *Williams*, 579 F. Supp. 3d at 784.

Moreover, *Great-West* and *Montanile* specifically addressed whether quasi-contractual claims for a money judgment brought by a fiduciary *against a beneficiary* were claims for equitable relief.  *See Great-West*, 534 U.S. at 210; *Montanile*, 577 U.S. at 138.  Contractual claims are, of course "quintessentially" *legal* claims for *legal* remedies, *Great*-West, 534 U.S. at 210 (citation omitted), which is why the Supreme Court in *Great-West* turned to *contract* treatises—not trust treatises—in analyzing the legal nature of the monetary remedies sought, *id.* at 211.  Those decisions have no bearing on the nature of Plaintiffs' claims for non-contractual monetary relief here, as other courts have noted.  *See Silva*, 185 F. Supp. 3d at 702-703; *Tracey*, 2019 WL 1005488, at *3.[25]

---

[25] The district court also relied on cases about corporate-misfeasance claims asserted by bankruptcy trustees based on principles of corporate law.  These cases do not bear on the nature of trust-law remedies, *see Oberly v. Kirby*, 592 A.2d 445, 466–67 (Del. 1991) (noting that corporate law and trust law are different in significant respects); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (Del. Ch. 1994) (same), *aff'd,* 663 A.2d 1156 (Del. 1995).

****

*Granfinanciera* Step 2 is not a close call:  Plaintiffs sought equitable claims for equitable remedies and therefore were not entitled to a jury trial.  But even if Step 2 were a toss-up, *Granfinanciera* Step 1 is so undisputedly clear that this Court should conclude that Plaintiffs are not entitled to a jury trial on their claims under 29 U.S.C. § 1132(a)(2)—otherwise, Step 1 of *Granfinanciera* would be rendered a nullity.

## CONCLUSION

The district court's summary judgment ruling should be affirmed.  If, however, the Court chooses to vacate the district court's decision, it should also reverse the district court's ruling that Plaintiffs are entitled to a jury trial.

February 13, 2023

James O. Fleckner
Jordan Bock
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
(617) 570-1000

Respectfully submitted,

*/s/  Jaime A. Santos*
Jaime A. Santos
DeMario M. Carswell
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC  20036
(202) 346-4000

*Counsel for Appellee-Cross Appellant John Hancock Life Insurance Company (U.S.A.)*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 15,298 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word.

February 13, 2023                                   /s/ *Jaime A. Santos*
                                                    Jaime A. Santos

## CERTIFICATE OF SERVICE

I certify that on February 13, 2023, I filed the foregoing brief with the Clerk of the Court by using the ECF system.  I also certify that the foregoing document is being served this day via transmission of Notices of Electronic Filing generated by ECF to all counsel of record.

/s/ *Jaime A. Santos*
Jaime A. Santos